1
2
3
4
5
**JAMES CHRISTIAN, PLC**
James S. Christian, State Bar No. 023614
CityScape Phoenix
1 E. Washington St., Ste. 500
Phoenix, Arizona 85004
TELEPHONE: (602) 478-6828
EMAIL:  jsc@jameschristianlaw.com
*Liaison Counsel for Plaintiff*

6
7
8
9
10
**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown, Pro Hac In Process
127A Cove Road
Oyster Bay Cove, New York 11771
TELEPHONE: (516) 922-5427
EMAIL:  tbrown@thebrownlawfirm.net
*Counsel for Plaintiff*

11
12
13

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA, TUCSON DIVISION

14
15
16
17
18
19
20
21
22
23
24
25
26

| | |
|---|---|
| LiPo Ching, Derivatively and on Behalf of AudioEye, Inc.,<br><br>             Plaintiff,<br><br>             vs.<br><br>Nathaniel Bradley, Edward O'Donnell, Paul Arena, Carr Bettis, Ernest Purcell, Anthony Coelho, Edward Withrow III, Sean Bradley, James Crawford, and Matthew T. Mellon II,<br><br>             Defendants,<br><br>             and<br><br>AudioEye, Inc.,<br><br>             Nominal Defendant. | Case No.:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><br>JURY TRIAL DEMANDED |

27
28
        Plaintiff LiPo Ching ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant AudioEye, Inc. ("AudioEye" or the "Company"), files

this Verified Shareholder Derivative Complaint against Defendants Nathaniel Bradley, Edward O'Donnell, Paul Arena, Carr Bettis, Ernest Purcell, Anthony Coelho, Edward Withrow III, Sean Bradley, James Crawford, and Matthew T. Mellon II (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement.  As and for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action, brought for the benefit of Nominal Defendant AudioEye, which seeks to remedy wrongdoing committed by AudioEye's directors and officers in violation of their fiduciary duties to the Company and its shareholders.

2.      AudioEye is a company that is "focused on creating voice driven technologies that will improve the mobility, usability and accessibility of all Internet and mobile content."  According to the Company, its patented technology is "at the center of the shift of mobile Internet consumers from keypad, mouse and other vision-dependent user experiences to a completely voice-driven and conversational medium" and "when connected to voice recognition and artificial intelligence engines, [it] can provide for a fully Audio Internet® experience complete with voice navigation and

voice-driven transactions."

3.    In recent years, the Company showed year-over-year growth.    The Company reported revenues of $125,521 for the year ended December 2011, $279,062 for the year ended December 2012, and $1.4 million for the year ended December 2013.

4.    Anxious to continue the upward trend and obtain maximal funding through various offerings of Company securities, the Individual Defendants caused the Company to report record-breaking revenue, profit, and income figures quarter-over-quarter, beginning in the first quarter of 2014.    The explosive growth in revenue, the Company insisted, was due to technology licensing deals.

5.    The figures presented by the Company were outstanding and represented a promising future for the Company.    As such, the price of the Company's common stock soared $0.79 or 282%, from a close of $0.28 on June 12, 2014 to a close of $1.07 on July 22, 2014.

6.    However unbelievable the reported figures seemed, the Company consistently assured investors that the Company prepared its financial figures presented in SEC filings, including its revenue figures derived from nonmonetary licensing transactions, in compliance with United States Generally Accepted Accounting Principles ("GAAP") and that it maintained effective internal control over financial reporting.

7.    These assurances were false, however.    On April 1, 2014, the Company revealed that its financial figures were not in compliance with GAAP and that it misreported revenue figures for at least three financial quarters in 2014.

8.    The Company was forced to restate their first, second, and third quarter 2014 financial statements, erase 92% of the Company's reported revenue during those quarters, and make numerous other changes, which together revealed that the Company was in dismal shape.

9.    Shortly after the truth was revealed, the Company's common stock lost

almost 76% of its original value, falling from a close of $0.41 per share on March 31, 2015 to a close of $0.10 per share by April 21, 2015.

10.    Between May 14, 2014 and April 1, 2015 (the "Relevant Period"), the investing public was under a false impression of, *inter alia*, the Company's financial position, prospects, profits, sales, revenue, and net income.  During the Relevant Period, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact regarding, at least, (1) the Company's total revenue and revenue from licensing transactions; (2) the Company's gross profit, net income, and other financial figures affected by revenue; (3) the Company's compliance with applicable regulations, (4) the Company's compliance with GAAP, (5) the Company's reckless nominating practices that caused high turnover at the Company, (6) the Company's maintenance of disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management to allow for timely decisions regarding required disclosure, and (7) the effectiveness of the Company's internal controls and review procedures.  These facts pertained to the Company's business, operations, and prospects and were known to the Individual Defendants or recklessly disregarded by them.

11.    In light of the Individual Defendants' misconduct, a majority of the board of directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

12.    The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and unjust enrichment.

1

**JURISDICTION AND VENUE**

2      13.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332.   Plaintiff and

3  Individual Defendants are citizens of different states and the amount in controversy

4  exceeds the sum or value of $75,000, exclusive of interest and costs.

5      14.     The Court has personal jurisdiction over each of the Defendants because

6  each Defendant is either a corporation conducting business and maintaining operations

7  in this District, or he is an individual who is a citizen of Arizona or who has minimum

8  contacts with this District to justify the exercise of jurisdiction over them.   Venue is

9  proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial

10  portion of the transactions and wrongs complained of herein occurred in this District,

11  and the Defendants have received substantial compensation in this district by engaging

12  in numerous activities that had an effect in this District.

13

**PARTIES**

14

**Plaintiff**

15      15.     Plaintiff is a current shareholder of AudioEye common stock.   Plaintiff

16  has continuously held AudioEye common stock at all relevant times.   Plaintiff is a

17  citizen of California.

18

**Nominal Defendant**

19      16.     Nominal defendant AudioEye is a Delaware corporation with principal

20  executive offices located at 5210 E. Williams Circle, Suite 750, Tucson, Arizona

21  85711.

22      17.     The Company's shares trade on the OTCQB Venture Marketplace

23  ("OTC") under the ticker symbol "AEYE."

24

**Defendant Nathaniel**

25      18.     Defendant Nathaniel Bradley ("Nathaniel") was the Company's President

26  and Chief Executive Officer ("CEO"), as well as a Company director, at all relevant

27  times.   Defendant Nathaniel resigned as Chief Executive Officer and President effective

28

April 24, 2015. Effective August 27, 2015 Defendant Nathaniel resigned from his board position and his position as Chief Innovation Officer, which he held at the time. According to the Company's Annual Report for the fiscal year ended December 31, 2013, filed with the SEC on March 31, 2014 (the "2013 10-K"), as of March 15, 2014, Defendant Nathaniel beneficially owned 6,785,917 shares of the Company's common stock, which represented 12.13% of all issued and outstanding shares of Company common stock at the time. According to the Company's Annual Report for the fiscal year ended December 31, 2014, filed with the SEC on July 10, 2015 (the "2014 10-K"), as of June 10, 2015, Defendant Nathaniel beneficially owned 10,399,569 shares of the Company's common stock, which represented 12.78% of all issued and outstanding shares of Company common stock at the time. Given that the price per share of the Company's common stock at the close of trading on July 22, 2014, the peak of the Relevant Period, was $1.07, Nathaniel owned at least $7.26 million worth of AudioEye stock.

19. For the fiscal year ended December 31, 2014, Defendant Nathaniel received $227,525 in compensation from the Company on a $227,525 salary. For the fiscal year ended December 31, 2015, Defendant Nathaniel received $127,981 in compensation from the Company on a $127,981 salary.

20. The 2014 10-K stated the following about Defendant Nathaniel:

***Nathaniel Bradley***. Mr. Bradley served as a director of ours from our company's founding in 2005 to the present, as Chief Executive Officer and President from July 2007 to April 2015, and as Founder, Chief Innovation Officer and Treasurer since April 2015. Mr. Bradley is a recognized pioneer and active expert in the new media Internet technology sector. He is the named inventor of several Internet technology patents and patents pending with U.S. Patent and Trademark Office. Over the past decade, Mr. Bradley has been involved in the invention, reduction to practice, commercial licensing, and enforcement of foundational Internet and mobile technology patents. In addition to managing the growth of AudioEye's patent portfolio through invention, Mr. Bradley is developing an intellectual property operation in Tucson, Arizona. Prior to AudioEye, Mr. Bradley was Chairman of the Board of

6

Modavox®, founder and Managing Member of Kino Digital, Kino Communications and Kino Interactive and currently serves as a managing member of Bradley Brothers, LLC, an Arizona-based investment company. We believe that Mr. Bradley's executive management experience with companies that do business over the Internet and background in financial business transactions makes him qualified to serve as our Chief Innovation Officer, Treasurer and as a director.

### Defendant O'Donnell

21.     Defendant Edward O'Donnell ("O'Donnell") was the Company's Chief Financial Officer ("CFO") at all relevant times until he resigned on March 29, 2015, one day before the end of the Relevant Period. According to the 2013 10-K, as of March 15, 2014, Defendant O'Donnell beneficially owned 28,360 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 22, 2014, the peak of the Relevant Period, was $1.07, O'Donnell owned at least $30,345 worth of AudioEye stock.

22.     For the fiscal year ended December 31, 2014, Defendant O'Donnell received $255,604 in compensation from the Company on a $160,000 salary. This included $160,000 in cash and almost $96,000 in stock. For the fiscal year ended December 31, 2015, Defendant O'Donnell received $81,855 in compensation from the Company, in all cash and on a prorated basis.

23.     The 2013 10-K stated the following about Defendant O'Donnell:
*Edward O'Donnell*: Mr. O'Donnell joined our company in February 2013 and has served as our Chief Financial Officer since April 2013. Mr. O'Donnell has over 20 years of executive experience in accounting, finance, investor relations, SEC reporting and taxation. From December 2010 until January 2013, Mr. O'Donnell served as Vice President of Finance for Augme Technologies, Inc. (OTC.BB: AUGT), which provides strategic services and mobile marketing technology to leading consumer and healthcare brands. From January 2007 until November 2010, Mr. O'Donnell served as Chief Financial Officer of Carlyle Capital Group LLC, a venture capital and private equity firm. Previously, Mr. O'Donnell also served as Senior Vice President of Finance & Investor Relations of ACTV, Inc. (NASDAQ: IATV), where he developed the investor relations department before the company was purchased by OpenTV, a subsidiary of Liberty Media. Previously,

Mr. O'Donnell was a member of Aloysius Lyons, LLC. Aloysius Lyons, LLC filed for protection under Chapter 7 of the federal bankruptcy laws in 2007. Aloysius Lyons, LLC received a discharge relating to the matter in 2009 and has been dissolved. Mr. O'Donnell is a Certified Public Accountant in New York and a member of NYSSCPAs and AICPA. Mr. O'Donnell received his undergraduate degree in Accountancy from Villanova University in 1991 and his MBA from Columbia Business School in 2003. We believe that Mr. O'Donnell's extensive education and background in accounting and finance makes him qualified to serve as our Chief Financial Officer.

**Defendant Arena**

24.     Defendant Paul Arena ("Arena") was the Company's Executive Chairman/Chairman of the Board until his separation from the Company on March 5, 2015.  Under the Separation Agreement between Defendant Arena and the Company, Defendant Arena was given 500,000 shares of Company common stock, the option to purchase an additional 1,000,000 shares of Company common stock, and a consulting agreement with Defendant Arena's business through which the Company paid his business $267,000.  Just 15 months before Defendant Arena's separation from the Company, on January 27, 2014, he entered into an employment agreement with the Company *for a term of two years*, under which he had "direct responsibility working in conjunction with the Company's Chief Executive Officer, over operations, sales marketing, financial accounting and SEC reporting, operational budgeting, sales costing analysis, billing and auditor interfacing."  According to the 2013 10-K, as of March 15, 2014, Defendant Arena beneficially owned 1,822,500 shares of the Company's common stock, which represented 3.09% of all issued and outstanding shares of Company common stock at the time.  The 2014 10-K does not disclose Defendant Arena's stock holdings as of June 10, 2015.  Given that the price per share of the Company's common stock at the close of trading on July 22, 2014, the peak of the Relevant Period, was $1.07, Arena owned at least $1.95 million worth of AudioEye stock.

25.     For the fiscal year ended December 31, 2014, Defendant Arena received over $1.6 million in compensation from the Company on a $310,000 salary.  This

included $1.2 million in cash and $303,562 in stock.   For the fiscal year ended December 31, 2015, Defendant Arena received $334,600 in compensation from the Company, in cash, on a $67,600 salary.

26.     The 2013 10-K stated the following about Defendant Arena:

**Paul Arena**.  Mr. Arena has served as a director and as our Executive Chairman/Chairman of the Board since January 2014.  From May 2000 to present, Mr. Arena has held the positions of Chairman of the Board, Chief Executive Officer, President and owner of AIM Group, Inc., an investment holding company.  Previously, from June 2010 to December 2012, he held various executive positions including Chairman of the Board, Chief Executive Officer, Director, Principal Financial Officer of Augme Technologies, Inc. and subsidiaries (now known as Hipcricket, Inc.).  From February 2002 to March 2010, Mr. Arena held various executive positions including Chairman of the Board, Chief Executive Officer, Director, Principal Financial Officer and founder of Geos Communications (formerly i2 Telecom International) and its subsidiaries.  Mr. Arena served in various executive capacities including Chairman of the Board, Chief Executive Officer, President Director, and founder of Cereus Technology Partners, Inc. and its subsidiaries, from May 1991 to April 2000. Cereus became a NASDAQ-listed public company that achieved a market capitalization in excess of $350 million prior to Mr. Arena's departure. During 1994, Mr. Arena was a financial advisor to and became a minority interest owner in Great Lakes Pulp & Fiber, Inc., a $224 million project financing and one of the world's largest paper recycling facilities.

From June 1990 to August 1991, Mr. Arena was a financial consultant. From February 1988 to January 1990, he was a Senior Vice President and partner of Gulfstream Financial Associates, Inc., a subsidiary of the Kemper Group. During the period 1982 through 1988, Mr. Arena held Vice President positions with Cralin & Co., Drexel, Burnham, Lambert, Inc. and Interstate Securities Corporation, all New York Stock Exchange member investment firms. Mr. Arena assisted in the deal structuring and financing of converting motion picture films into color, mercury detection devices for drilling rigs, ATM debit cards, color video telephones, color fax transmissions, Internet service providers, enterprise application services, mobile marketing and advertising, Internet telephony; various types of manufacturing; and various commercial real estate ventures for hotel, shopping center and multi-family housing projects. We believe that Mr. Arena's executive management experience

and background in financial business transactions makes him qualified to serve as our Executive Chairman/Chairman of the Board and as a director.

**Defendant Bettis**

27. Defendant Carr Bettis ("Bettis") has been a Company director since December 2012 and Executive Chairman/Chairman of the Board since March 2015, when he filled the vacancy left by Defendant Arena's departure. According to the 2013 10-K, as of March 15, 2014, Defendant Bettis beneficially owned 3,700,730 shares of the Company's common stock, which represented 6.77% of all issued and outstanding shares of Company common stock at the time. According to the 2014 10-K, as of June 10, 2015, Defendant Bettis beneficially owned 6,145,855 shares of the Company's common stock, which represented 7.55% of all issued and outstanding shares of Company common stock at the time. Given that the price per share of the Company's common stock at the close of trading on July 22, 2014, the peak of the Relevant Period, was $1.07, Bettis owned at least $3.96 million worth of AudioEye stock.

28. For the fiscal year ended December 31, 2015, Defendant Bettis received $526,507 in compensation from the Company.

29. The 2014 10-K stated the following about Defendant Bettis:

*Dr. Carr Bettis*. Dr. Bettis has served as a director of ours since December 2012, and previously served as a director of ours from July 2007 to April 2010. Dr. Bettis has served as Executive Chairman/Chairman of the Board since March 2015. Dr. Bettis founded and has been the Chief Architect of numerous financial technology innovations and businesses over the last 15 years that have been acquired by Merrill Lynch, Thomson Financial, Primark/Disclosure and Advanced Equities/GreenBrook Financial. From 1996 to 2011, Dr. Bettis was the Chairman and Founder of Gradient Analytics, one of the largest independent equity research firms in the United States. He has served as Chairman and Co-Founder of Verus Analytics, a quantitative compensation, proxy intelligence and behavioral governance firm since 1996. He also serves on the board of directors of iMemories, an Arizona-founded technology company. Since 2007, he has also managed his family's private equity portfolio via his firm, Fathom Lab. Dr. Bettis is a former tenured professor and maintains a clinical-affiliation with Arizona

State University as Research Professor of Finance at the W.P. Carey School of Business. He is frequently cited in national and international financial media. His research has been published in academic and professional journals such as the Journal of Financial Economics, Review of Financial Studies, Journal of Financial and Quantitative Analysis, and the Financial Analyst Journal. Dr. Bettis holds undergraduate degrees in finance and accounting, and received his Ph.D. from Indiana University in 1992. We believe that Dr. Bettis' extensive education and background in finance makes him qualified to serve as our Executive Chairman/Chairman of the Board and as a director.

**Defendant Purcell**

30. Defendant Ernest Purcell ("Purcell") has been a Company director since March 2014. He serves as Chairman of the Audit Committee. According to the 2013 10-K, as of March 15, 2014, Defendant Purcell beneficially owned 450,000 shares of the Company's common stock. According to the 2014 10-K, as of June 10, 2015, Defendant Purcell beneficially owned 4,456,919 shares of the Company's common stock, which represented 5.48% of all issued and outstanding shares of Company common stock at the time.

31. The 2014 10-K stated the following about Defendant Purcell:

*Ernest Purcell*. Mr. Purcell has served as a director of ours since March 2014. Mr. Purcell has more than two decades of experience in the financial services and advisory industries and has been involved in providing fairness and solvency opinions on numerous U.S. and European transactions. He has technical expertise in financial due diligence, strategic business valuation, financial restructurings and divestitures. Since 1997, Mr. Purcell has been employed by Houlihan Lokey, Inc., where he is currently a Senior Managing Director, a member of the Board of Directors, and the Head of International Financial Advisory Services. Houlihan Lokey is an international investment bank with expertise in mergers and acquisitions, capital markets, financial restructuring, and valuation. The firm serves corporations, institutions, and governments worldwide with offices in the United States, Europe, and Asia. Houlihan Lokey is ranked as the No. 1 global restructuring advisor, the No. 1 M&A fairness opinion advisor for U.S. transactions over the past 10 years, and the No. 1 M&A advisor for U.S. transactions under $3 billion, according to Thomson Reuters. Mr. Purcell is based in Houlihan Lokey's Miami office, having recently returned to the U.S. after serving more than six years in the London office. With significant experience in the valuation

of securitized vehicles and structured investment vehicles, Mr. Purcell has advised numerous hedge fund and private equity sponsors on the valuation of their portfolio assets. He has structured, negotiated, and closed complex financial and capital transactions in many industries, including transportation, financial services, telecommunications, energy, aviation, consumer products and industrial products. From 1989 to 1996, Mr. Purcell served in a number of positions with Valuemetrics, Inc. / VM Equity Partners, where he specialized in the valuation of publicly owned and privately held companies, strategic financial planning, and bankruptcy analysis. Mr. Purcell earned bachelor's degree in Economics and Finance from the University of Florida in 1973 and earned his MBA, with concentrations in Finance and Statistics, from the University of Chicago. He is a member of the Institute of Directors, British American Business and the Corporate Development Association. He is also a member of the Valuation Special Interest Group of the Institute of Chartered Financial Accountants in England and Wales, the Society of Share and Business Valuers, and the Business Valuation Association. We believe that Mr. Purcell's extensive education and background in finance makes him qualified to serve as a director.

**Defendant Coelho**

32.    Defendant Anthony Coelho ("Coelho") has been a Company director since June 2014.   According to the 2014 10-K, as of June 10, 2015, Defendant Coelho beneficially owned 250,000 shares of the Company's common stock.   Given that the price per share of the Company's common stock at the close of trading on July 22, 2014, the peak of the Relevant Period, was $1.07, Coelho owned about $267,500 worth of AudioEye stock.

33.    The 2014 10-K stated the following about Defendant Coelho:

***Anthony Coelho***. Mr. Coelho has served as a director of ours since June 2014. Mr. Coelho was a member of the U.S. House of Representatives from 1978 to 1989. After leaving Congress, he joined Wertheim Schroder & Company, an investment banking firm in New York and became President and CEO of Wertheim Schroder Financial Services from 1990 to 1995. From 1995 to 1997, he served as Chairman and CEO of an education and training technology company that he established and subsequently sold. He served as general chairman of the presidential campaign of former Vice President Al Gore from April 1999 until June 2000. Since 1997, Mr. Coelho has worked independently as a business and political consultant. Mr. Coelho also served as Chairman of the President's Committee on Employment of People with Disabilities

from 1994 to 2001. He previously served as Chairman of the Board of the Epilepsy Foundation. Mr. Coelho has served on a number of corporate boards. In the last five years he has served on the boards of CepTor Corporation, Cyberonics, Inc., Stem Cell Innovation, Inc., Universal Access Global Holdings, Inc, and since 1991, he has been a member of the board of Service Corporation International, a publicly traded company, and since 2001, he has been a member of the board of Warren Resources, Inc., a publicly traded company. Mr. Coelho earned a Bachelor of Arts degree in Political Science from Loyola Marymount University in 1964. We believe that Mr. Coelho's political acumen and contacts as well as his extensive executive, financial and business experience makes him qualified to serve as a director[.]

**Defendant Withrow**

34.    Defendant Edward Withrow III ("Withrow") was a Company director from August 2012 until his resignation effective September 29, 2015. According to the 2013 10-K, as of March 15, 2014, Defendant Withrow beneficially owned 824,867 shares of the Company's common stock. According to the 2014 10-K, as of June 10, 2015, Defendant Withrow beneficially owned 606,250 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 22, 2014, the peak of the Relevant Period, was $1.07, Purcell owned at least $882,607 worth of AudioEye stock.

35.    The 2014 10-K stated the following about Defendant Withrow:

*Edward Withrow III*. Mr. Withrow has served as a director of ours since August 2012. With over 20 years' experience as a financier, broker, manager, marketer and developer of innovations in various industries, Mr. Withrow has developed an expertise in finding small undervalued and underfunded companies and building them up through his leadership in strategic initiatives and business development activities. In 2000, Mr. Withrow founded Huntington Chase Financial Group, LLC, and Huntington Chase, Ltd. to engage in venture capital, private equity and merchant banking activities. From 2000 until the present, Mr. Withrow acquired, restructured, merged, created and was a senior advisor to approximately 10 companies. In 2002, Mr. Withrow became the CEO of Reward Enterprises, Inc., a public company and early adopter of Voice over Internet Protocol (VoIP) technology. Mr. Withrow also founded Symphony Card, LLC, an issuer of stored value debit cards. In 2004,

Mr. Withrow became the CEO of Addison-Davis Diagnostics, Ltd., a leading edge point-of-care diagnostic company. In 2005, he was the President of The Cabo Group, Ltd., a publicly traded company whose primary functions were wholesale marketing and distribution of retail products. In 2006, Mr. Withrow became the President and CEO of Montecito Bio Sciences, Ltd., a multi-faceted medical diagnostics company. In 2008, Mr. Withrow founded Ecologic Transportation, Inc., a publicly traded company and is presently its Chairman. Mr. Withrow also founded Parallax Diagnostics, Inc., a fully reporting company headquartered in Cambridge, Massachusetts, currently in its developmental stage. He works with Planet Hope a Los Angeles based foundation that works with abused children and battered women. We believe that Mr. Withrow's background in finance makes him qualified to serve as a director.

**Short-Term Directors During the Relevant Period**

36.     Defendant Sean Bradley ("Sean") was the Company's Chief Technology Officer ("CTO"), Vice-President, and Secretary, at all relevant times, and a Company director from August 2012 to June 2014.  Defendant Sean was promoted to the position of President in April 2015.  According to the 2013 10-K, as of March 15, 2014, Defendant Sean beneficially owned 6,719,238 shares of the Company's common stock, which represented 12.02% of all issued and outstanding shares of Company common stock at the time.  According to the 2014 10-K, as of June 10, 2015, Defendant Sean beneficially owned 7,294,118 shares of the Company's common stock, which represented 8.96% of all issued and outstanding shares of Company common stock at the time.  Given that the price per share of the Company's common stock at the close of trading on July 22, 2014, the peak of the Relevant Period, was $1.07, Sean owned at least $7.19 million worth of AudioEye stock.

37.     The 2014 10-K stated the following about Defendant Sean:

*Sean Bradley*. Mr. Bradley has been involved with us from our founding in 2005 to the present and has served as Secretary since April 2010, as Vice President from April 2010 to April 2015, as a director from August 2012 to June 2014, and as Chief Technology Officer since August 2012, and as President since April 2015. Mr. Bradley has co-founded several technology companies, including Kino Digital, LLC, and

14

Kino Communications, LLC, from 1999-2005. Over the past nine years, he has led an international team of software developers, has produced global webcasting technologies, and planned, designed and managed the fulfillment of intellectual property assets, including the next generation mobile marketing solutions for industry leading Hipcricket. In the past, Mr. Bradley was chief architect of AdLife, BoomBox® Video and Audio Platforms for Augme Technologies, Inc. Mr. Bradley is proficient in several programming and web development languages and has engineered online communications systems for IBM, General Dynamics, Avnet and many others. In 2005, he was recognized by Arizona State's WP Carey School of Business as a leader in his field for work he completed for the Arizona Department of Health and Human Services. In addition to his role at our company, Mr. Bradley is a managing member of Bradley Brothers, LLC, an Arizona-based investment company. We believe that Mr. Bradley's extensive education and background in business and technology make him qualified to serve as our President, Chief Technology Officer and Secretary. In 2003 Mr. Bradley obtained his BA from Arizona International College at the University of Arizona, graduating summa cum laude and with highest academic distinction for all eight undergraduate semesters.

38. Defendant James Crawford ("Crawford") served as a Company director from August 2012 until his resignation from the Board on July 22, 2014. He was, and remained at all relevant times, the Company's Chief Operating Officer and Treasurer. According to the 2013 10-K, as of March 15, 2014, Defendant Crawford beneficially owned 1,431,963 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 22, 2014, the peak of the Relevant Period, was $1.07, Crawford owned at least $1.53 million worth of AudioEye stock.

39. The Company's 2013 10-K stated the following about Defendant Crawford:

*James Crawford*. Mr. Crawford has been involved with us from our company's founding in 2005 to the present and has served as a director, Chief Operating Officer and Treasurer since August 2012. Mr. Crawford was a founding member of Kino Interactive, LLC, a developer of enhanced communication software and digital media solutions, and of our company. Mr. Crawford's experience as an entrepreneur spans the entire

life cycle of companies from start-up capital to compliance officer and director of reporting public companies. Mr. Crawford is also the Chief Operating Officer of Marathon Patent Group since March 2013. Prior to his involvement as Chief Operating Officer of our company, Mr. Crawford served as a director and officer of Augme Technologies, Inc. from March 2006 through August 2011, and assisted the company in maneuvering through the initial challenges of acquisitions executed by the company through 2011 that established the company as a leading mobile marketing company in the United States. Mr. Crawford is experienced in public company finance and compliance functions. He has extensive experience in the area of intellectual property creation, management and licensing. Prior to our company, Mr. Crawford served on the boards of directors of Modavox® and Augme Technologies, and as founder and managing member of Kino Digital, Kino Communications and Kino Interactive. We believe that Mr. Crawford's experience as a member of Kino's and Augme Technologies, Inc.'s management team and background in technology makes him qualified to serve as our Chief Operating Officer and Treasurer and as a director.

40.     Defendant Matthew T. Mellon II ("Mellon") served as a Company director from July 22, 2014, when he assumed his role to fill a vacancy on the Board left by Defendant Crawford's departure, until his resignation on April 21, 2015. The Company-issued press release on July 23, 2014, announcing Defendant Mellon's appointment to the Board, stated the following about him:

Born in New York City into the renowned Mellon and Drexel families of Bank of New York Mellon Corp. and Drexel-Burnham-Lambert, Matthew Mellon was surrounded by the worlds of banking, business, and innovative technology. Today, Matthew carries on his family's legacy as an entrepreneur, private equity investor, business advisor and philanthropist.

Since July 2013, Mr. Mellon has been the Co-founder and President of Coin.co, a New York City-based software, technology and cryptographic incubator. Also, from July 2013 to present he has served as Co-founder of Coin Validation, Inc., and has been involved in the education of banks, Congress and merchants about the benefits and utilization of virtual currencies. He is an active supporter of disruptive financial technology. Additionally, from May 2008 to present Mr. Mellon has been the Co-founder and Co-creative director for Hanley Mellon, a lifestyle brand company launching a women's ready to wear collection. From 1964 to September 2012, Mr. Mellon was part of the Family Office of BNY

Mellon Bank.  He also served as Chairman of the New York Republican Party's Finance Committee from April 2011 to July 2013 and maintains associations with Drexel University and Carnegie Mellon University, both of which were founded by family members.  In 2002, Matthew continued to venture into the luxury men's shoe industry and founded Harry's of London, named for his grandfather Harry Stokes. The innovative men's shoes were built with a sneaker sole and a dress shoe top and had a stork logo imprinted in the sole, taken from the Mellon family crest. In 2006, Matthew sold a 40 percent stake in the company to the Richemont Group's Atelier Fund.

He is also involved with the National Gallery of Art in Washington DC, where a majority of the collection was donated to the nation by his great relative Andrew Mellon. Previously, from February 1999 to August 2011, Mr. Mellon was Co-creative Director-Men's Division of Jimmy Choo.

**Non-Party Post Relevant Period Directors**

41.    Alexandre Zyngier ("Zyngier") has been a Company director since September 2015.  According to the Company's Annual Report for the fiscal year ended December 31, 2015 filed with the SEC on March 30, 2016 (the "2015 10-K"), as of March 21, 2016, Zyngier beneficially owned 1,738,875 shares of the Company's common stock.

42.    The 2015 10-K stated the following about Zyngier:

***Alexandre Zyngier.*** Mr. Zyngier has served as a director since September 2015. Mr. Zyngier founded Batuta Advisors in 2013 to pursue high return investment opportunities in the distressed and turnaround sectors. Mr. Zyngier has over 20 years of investment, strategy, and operating experience. He is currently a director of GT Advanced Technologies and Atari SA. Mr. Zyngier has worked as a Portfolio Manager, investing in public and private opportunities, at Alden Global Capital, Goldman Sachs & Co. and Deutsche Bank Co. He was also a strategy consultant at McKinsey & Company and a technical brand manager at Procter & Gamble.  Mr. Zyngier holds an MBA in Finance and Accounting from the University of Chicago and a BSc. in Chemical Engineering from UNICAMP in Brazil. We believe that Mr. Zyngier's extensive education and background in finance and strategy makes him qualified to serve as a director.

43.    Christine Griffin ("Griffin") has been a Company director since November 2015.   According to the 2015 10-K, as of March 21, 2016, Griffin beneficially owned 312,500 shares of the Company's common stock.

44.    The 2015 10-K stated the following about Griffin:

***Christine Griffin.*** Ms. Griffin has served as a director since November 2015. Since 2013, Christine Griffin has served as the Executive Director of the Disability Law Center, a position that she held previously from 1996 to 2005. Ms. Griffin also served as the Assistant Secretary for Disability Policies and Programs for the Massachusetts Executive Office of Health and Human Services. As such, she was responsible for oversight of the Department of Developmental Services, the Massachusetts Rehabilitation Commission, the Massachusetts Commission for the Blind, the Massachusetts Commission for the Deaf and Hard of Hearing, and the Soldiers' Homes in Chelsea and Holyoke. Additionally, she had cross-Secretariat responsibility for disability-related policies and programs. Ms. Griffin has an extensive history of work involving disability across public and private sectors. As Deputy Director of the U.S. Office of Personnel Management, she was responsible for federal agencies' implementation of President Obama's Executive Order on Increasing Employment of Individuals with Disabilities in the Federal Workforce. Ms. Griffin also planned and implemented the first federal hiring event for people with disabilities and oversaw the creation of a newly established Government-wide Diversity and Inclusion Office. As a Commissioner on the Equal Employment Opportunity Commission, she was responsible for the development of enforcement policies, and she planned and presided over public EEOC hearings and investigations of federal employee complaints. She also established the LEAD (Leadership for Employment of Americans with Disabilities) Initiative, a national outreach and education campaign to address the declining number of federal employees with severe disabilities. Ms. Griffin began her legal career as a Skadden Fellow at the Disability Law Center, where she provided outreach, training and representation on ADA issues to un-served and underserved communities within the disabled community in Massachusetts. With a history of providing capable leadership involving a range of disability policy issues, Ms. Griffin is currently Chair of the Board of the American Association of People with Disabilities (AAPD) and a member of the Massachusetts Developmental Disabilities Council. Ms. Griffin, who holds a law degree from Boston College and earned her undergraduate degree from the Massachusetts Maritime Academy, also served on active duty in the United States Army from 1974 until 1977. We believe that Mrs. Griffin's extensive education, private enterprise, public service and extensive

1  background in accessibility related solutions makes her qualified to serve
2  as a director.

3  **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

4  45.   By reason of their positions as officers, directors and/or fiduciaries of
5  AudioEye and because of their ability to control the business and corporate affairs of
6  AudioEye, the Individual Defendants owed AudioEye and its shareholders fiduciary
7  obligations of trust, loyalty, good faith, and due care, and were and are required to use
8  their utmost ability to control and manage AudioEye in a fair, just, honest, and equitable
9  manner.  The Individual Defendants were and are required to act in furtherance of the
10  best interests of AudioEye and its shareholders so as to benefit all shareholders equally.

11  46.   Each director and officer of the Company owes to AudioEye and its
12  shareholders the fiduciary duty to exercise good faith and diligence in the administration
13  of the Company and in the use and preservation of its property and assets and the highest
14  obligations of fair dealing.

15  47.   The Individual Defendants, because of their positions of control and
16  authority as directors and/or officers of AudioEye, were able to and did, directly and/or
17  indirectly, exercise control over the wrongful acts complained of herein.

18  48.   To discharge their duties, the officers and directors of AudioEye were
19  required to exercise reasonable and prudent supervision over the management, policies,
20  controls, and operations of the Company.

21  49.   Each Individual Defendant, by virtue of his or her position as a director
22  and/or officer, owed to the Company and to its shareholders the highest fiduciary duties
23  of loyalty, good faith, and the exercise of due care and diligence in the management and
24  administration of the affairs of the Company, as well as in the use and preservation of its
25  property and assets.  The conduct of the Individual Defendants complained of herein
26  involves a knowing and culpable violation of their obligations as directors and officers
27  of AudioEye, the absence of good faith on their part, or a reckless disregard for their

28

duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised AudioEye's Board at all relevant times.

50.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on the OTC, the Individual Defendants had a duty not to effect and to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's financials and business operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC accurate information based on the applicable accounting standards, so that the market price of the Company's common stock would be based upon truthful and accurate information.

51.    To discharge their duties, the officers and directors of AudioEye were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of AudioEye were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Arizona, the United States, and pursuant to AudioEye's own Code of Business Conduct and Ethics and internal guidelines;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality

performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how AudioEye conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of AudioEye and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that AudioEye's operations would comply with all laws and AudioEye's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

52.     Each of the Individual Defendants further owed to AudioEye and the shareholders the duty of loyalty requiring that each favor AudioEye's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

53.     At all times relevant hereto, the Individual Defendants were the agents of each other and of AudioEye and were at all times acting within the course and scope of such agency.

54.     Because of their advisory, executive, managerial, and directorial positions with AudioEye, each of the Individual Defendants had access to adverse, non-public information about the Company.

55.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AudioEye.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

56.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

57.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) to conceal adverse information concerning the Company's operations, financial condition, competitiveness, future business prospects, and internal controls;

1   and (iii) to artificially inflate the Company's stock price.

2        58.    The Individual Defendants accomplished their conspiracy, common

3   enterprise, and/or common course of conduct by causing the Company purposefully,

4   recklessly, or negligently to conceal material facts, fail to correct such

5   misrepresentations, and violate applicable laws.  Because the actions described herein

6   occurred under the authority of the Board, each of the Individual Defendants who are

7   directors of AudioEye was a direct, necessary, and substantial participant in the

8   conspiracy, common enterprise, and/or common course of conduct complained of

9   herein.

10        59.    Each of the Individual Defendants aided and abetted and rendered

11   substantial assistance in the wrongs complained of herein.  In taking such actions to

12   substantially assist the commission of the wrongdoing complained of herein, each of the

13   Individual Defendants acted with actual or constructive knowledge of the primary

14   wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or

15   should have been aware of his or her overall contribution to and furtherance of the

16   wrongdoing.

17        60.    At all times relevant hereto, each of the Individual Defendants was the

18   agent of each of the other Individual Defendants and of AudioEye, and was at all times

19   acting within the course and scope of such agency.

20                       **CODE OF ETHICS**

21        61.    The conduct of all of the Company's officers, directors, and employees is

22   governed by the Company's Code of Business Conduct and Ethics (the "Code of

23   Ethics").

24        62.    The Introduction of the Code of Ethics states that the Company and its

25   subsidiaries "will conduct its business honestly and ethically wherever [they] operate"

26   and "will maintain a reputation for honesty, fairness, respect, responsibility, integrity,

27   trust and sound business judgment."  The Introduction also states that the Company's

28

officers, directors, and employees are "expected to adhere to high standards of personal integrity."

63.     The Code of Ethics provides, as to "Compliance with Laws, Rules and Regulations," that:

> Obeying the law, both in letter and in spirit, is the foundation on which the Company's ethical standards are built. All directors, officers and employees must respect and obey the laws, rules and regulations of the United States and of the cities, states and countries in which we operate. In particular, all directors, officers and employees must comply with federal securities laws, and rules and regulations that govern the Company.

64.     The Code of Ethics provides, as to "Avoidance of Conflicts of Interest," that:

> The Company's directors, officers and employees must never permit their personal interests to conflict, or even appear to conflict, with the interests of the Company. A "conflict of interest" exists when a person's private interests interfere in any way, or even appear to interfere, with the Company's interests. A conflict situation can arise when a director, officer or employee takes actions, or has interests, that may make it difficult to perform his or her Company work objectively and effectively. Conflicts of interest may also arise when a director, officer or employee, or a member of his or her family, receives improper personal benefits as a result of his or her position with the Company. Loans to, or guarantees of the obligations of, directors, officers and employees and their family members may create conflicts of interest and may also be illegal.
>
> For example, it is a conflict of interest for a director, officer or employee to work simultaneously for a competitor or customer, even as a consultant or board member. Each director, officer and employee must be particularly careful to avoid representing the Company in any transaction with a third party with whom the director, officer or employee has any outside business affiliation or relationship. The best policy is to avoid any direct or indirect business connection with our customers and competitors, except on our behalf.
>
> Conflicts of interest (including both actual and apparent conflicts of interest) are prohibited under this Code except in limited cases under guidelines or exceptions specifically approved in advance by the Company's Board of Directors.

Conflicts of interest may not always be clear-cut, so if you have a question, you should consult with our Chief Financial Officer ("CFO") or our legal counsel. Our CFO's and legal counsel's telephone numbers and addresses are set forth in Appendix A to the Code. Any director, officer or employee who becomes aware of any transaction or relationship that is a conflict of interest or a potential conflict of interest should bring it to the attention of our CFO or legal counsel.

65.     The Code of Ethics provides, as to "Insider Trading," that:

Trading in the Company's securities is covered by the Company's Insider Trading Policy, which Policy is hereby incorporated in its entirety in this Code. The Policy is acknowledged annually by all insiders of the Company. If you would like to receive a copy of the Insider Trading Policy or have any questions regarding such Policy, please contract our legal counsel.

66.     The Code of Ethics provides, as to "Public Disclosure of Information Required by the Securities Laws," that:

The Company is a public company that is required to file various reports and other documents with the SEC. An objective of this Code is to ensure full, fair, accurate, timely and understandable disclosure in the reports and other documents that we file with, or otherwise submit to, the SEC and in the press releases and other public communications that we distribute.

The federal securities laws, rules and regulations require the Company to maintain "disclosure controls and procedures," which are controls and other procedures that are designed to ensure that financial information and non-financial information that is required to be disclosed by us in the reports that we file with or otherwise submit to the SEC (i) is recorded, processed, summarized and reported within the time periods required by applicable federal securities laws, rules and regulations and (ii) is accumulated and communicated to our management, including our President or Chief Executive Officer and CFO, in a manner allowing timely decisions by them regarding required disclosure in the reports.

Some of our directors, officers and employees will be asked to assist management in the preparation and review of the reports that we file with the SEC, including recording, processing, summarizing and reporting to management information for inclusion in these reports. If you are asked to assist in this process, you must comply with all disclosure controls and procedures that are communicated to you by management regarding the preparation of these reports. You must also perform with diligence any

responsibilities that are assigned to you by management in connection with the preparation and review of these reports, and you may be asked to sign a certification to the effect that you have performed your assigned responsibilities.

SEC regulations impose upon our President, Chief Executive Officer and CFO various obligations in connection with annual and quarterly reports that we file with the SEC, including responsibility for:

- Establishing and maintaining disclosure controls and procedures and internal control over financial reporting that, among other things, ensure that material information relating to the Company is made known to them on a timely basis;

- Designing the Company's internal control over financial reporting to provide reasonable assurances that the Company's financial statements are fairly presented in conformity with generally accepted accounting principles;

- Evaluating the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting;

- Disclosing (i) specified deficiencies and weaknesses in the design or operation of the Company's internal control over financial reporting, (ii) fraud that involves management or other employees who have a significant role in the Company's internal control over financial reporting, and (iii) specified changes relating to the Company's internal control over financial reporting; and

- Providing certifications in the Company's annual and quarterly reports regarding the above items and other specified matters.

This Code requires our President or Chief Executive Officer and CFO to carry out their designated responsibilities in connection with our annual and quarterly reports, and this Code requires you, if asked, to assist our executive officers in performing their responsibilities under these SEC regulations.

67.     The Code of Ethics provides, as to "Record-Keeping," that:

The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions. For example, only the true and actual number of hours worked should be reported. Also, business expense accounts must be documented and recorded accurately. If you are not sure whether a certain expense is legitimate, ask our CFO.

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must accurately and appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's internal control over financial reporting and disclosure controls and procedures. All transactions must be recorded in a manner that will present accurately and fairly our financial condition, results of operations and cash flows and that will permit us to prepare financial statements that are accurate, complete and in full compliance with applicable laws, rules and regulations. Unrecorded or "off the books" funds or assets should not be maintained unless expressly permitted by applicable laws, rules and regulations.

Business records and communications often become public, and we should avoid exaggeration, derogatory remarks, guesswork or inappropriate characterizations of people and companies that can be misunderstood. This applies equally to e-mail, internal memoranda and formal reports.

Records should be retained in accordance with the Company's record retention policies, and records should be destroyed only if expressly permitted by our record retention policies and applicable laws, rules and regulations. If you become the subject of a subpoena, lawsuit or governmental investigation relating to your work at the Company, please contact our CFO or legal counsel immediately.

68.    The Code of Ethics provides, as to "Corporate Opportunities," that:

Directors, officers and employees are prohibited from taking for themselves personally opportunities that are discovered through the use of the Company's property or confidential information or as a result of their position with the Company, except upon the prior written consent of the Board of Directors. No director, officer or employee may use corporate property, information or position for improper personal gain; no director, officer or employee may use Company contacts to advance his or her private business or personal interests at the expense of the Company or its customers, suppliers or affiliates; and no director, officer or employee may directly or indirectly compete with the Company. Directors, officers and employees owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

69.    The Code of Ethics provides, as to "Competition and Fair Dealing," that:

We seek to outperform our competition fairly and honestly. We seek competitive advantage through superior performance, never through unethical or illegal business practices. Stealing proprietary information,

possessing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited. Each director, officer and employee should endeavor to respect the rights of and deal fairly with the Company's customers, suppliers, competitors and affiliates. No director, officer or employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other intentional unfair-dealing practice.

To maintain the Company's valuable reputation, compliance with our quality processes and safety requirements is essential. In the context of ethics, quality requires that our products and services be designed to meet our obligations to customers. All inspection and testing documents must be handled in accordance with all applicable laws, rules and regulations.

70.   The Code of Ethics provides, as to "Protection and Proper Use of Company Assets," that:

Directors, officers and employees should endeavor to protect the Company's assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on the Company's profitability. Any suspected incident of fraud or theft should be immediately reported for investigation. Company equipment should not be used for non-Company business, though incidental personal use of items such as telephones and computers may be permitted pursuant to written policies approved by the Board of Directors.

The obligation of directors, officers and employees to protect the Company's assets includes its proprietary information. Proprietary information includes intellectual property such as trade secrets, patents, trademarks and copyrights, as well as business, marketing and service plans, engineering and manufacturing ideas, designs, databases, records, salary information and any unpublished financial data and reports. Unauthorized use or distribution of this information would violate Company policy. It could also be illegal and result in civil or even criminal penalties.

71.   The Code of Ethics provides, as to "Enforcement of the Code of Business Conduct and Ethics," that:

A violation of this Code by any director, officer or employee will be subject to disciplinary action, including possible termination of employment. The degree of discipline imposed by the Company may be

influenced by whether the person who violated this Code voluntarily disclosed the violation to the Company and cooperated with the Company in any subsequent investigation. In some cases, a violation of this Code may constitute a criminal offense that is subject to prosecution by federal or state authorities.

72.     The Code of Ethics provides, as to "Compliance Procedures; Reporting Misconduct or Other Ethical Violations," that:

> Directors, officers and employees should promptly report any unethical, dishonest or illegal behavior, or any other violation of this Code or of other Company policies and procedures, to our CFO or our legal counsel. Their telephone numbers and addresses are set forth in Appendix A to this Code. All complaints with respect to questionable accounting or auditing matters should be made to the Chairman of our Audit Committee (whose telephone number and address is set forth in Appendix A) and may be made anonymously and will be confidential.

73.     Each recipient of the Code of Ethics was required to sign an acknowledgment form certifying that he or she "has read and understands the AudioEye, Inc. Code of Business Conduct and Ethics," "understands that AudioEye, Inc.'s Chief Financial Officer and legal counsel are available to answer any questions the undersigned has regarding the Code of Ethics," and "will continue to comply with the Code of Ethics for as long as the undersigned is subject thereto."

74.     In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of the Individual Defendants' scheme to issue materially false and misleading statements to the public and their other schemes described herein, including to facilitate and disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and unjust enrichment.  In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to comply with the applicable laws and regulations, avoid insider trading, protect corporate assets, engage in fair dealing, avoid using corporate opportunities for personal

gain, avoid conflicts of interest, appropriately maintain the Company's books, records, accounts, and financial statements, and ensure full, fair, accurate, timely and understandable disclosures in SEC filings and public statements.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background Law

75.    SEC Regulation S-X, codified at 17 C.F.R. § 210.4-01, sets a clear standard for SEC filings that are not prepared in compliance with GAAP.  Under the regulation, "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles **will be presumed to be misleading or inaccurate**, despite footnote or other disclosures . . . ."  17 C.F.R. § 210.4-01(a)(1) (emphasis added).

76.    Pursuant to statutory authority, the SEC promulgates GAAP for public companies through the Financial Accounting Standards Board ("FASB").  The FASB's policies on GAAP for non-governmental entities are codified in the Accounting Standards Codification ("ASC").

77.    ASC Topic 845 ("ASC 845") concerns "Nonmonetary Transactions." ASC 845-10-05 notes the following:

> Most business transactions involve exchanges of cash or other monetary assets or liabilities for goods or services. The amount of monetary assets or liabilities exchanged generally provides an objective basis for measuring the cost of nonmonetary assets or services received by an entity as well as for measuring gain or loss on nonmonetary assets transferred from an entity. Some transactions, however, involve either of the following:
>
> > a.  An exchange with another entity (reciprocal transfer) that involves principally nonmonetary assets or liabilities
> >
> > b.  A transfer of nonmonetary assets for which no assets are received or relinquished in exchange (nonreciprocal transfer).
>
> Both exchanges and nonreciprocal transfers that involve little or no monetary assets or liabilities are referred to as nonmonetary transactions.

78.    ASC 845-10-30-1 sets forth the value of nonmonetary transactions as follows:

> In general, the accounting for nonmonetary transactions **should be based on the fair values of the assets (or services) involved**, which is the same basis as that used in monetary transactions. Thus, the cost of a nonmonetary asset acquired in exchange for another nonmonetary asset is the fair value of the asset surrendered to obtain it, and a gain or loss shall be recognized on the exchange. The fair value of the asset received shall be used to measure the cost if it is more clearly evident than the fair value of the asset surrendered. Similarly, a nonmonetary asset received in a nonreciprocal transfer shall be recorded at the fair value of the asset received. A transfer of a nonmonetary asset to a stockholder or to another entity in a nonreciprocal transfer shall be recorded at the fair value of the asset transferred and a gain or loss shall be recognized on the disposition of the asset.[1]

79.    Importantly, ASC 845-10-30-3 explains that "[a] nonmonetary exchange shall be measured based on the recorded amount . . . of the nonmonetary asset(s) relinquished, and **not on the fair values** of the exchanged assets, **if** (a) [t]he fair value of neither the asset(s) received nor the asset(s) relinquished is determinable within reasonable limits."

80.    ASC 820-35-2 defines "fair value" as "the price that would be received to sell an asset . . . in an orderly transaction between market participants at the measuring date."

81.    Under ASC 820-35-24, reporting entities are required to use "valuation techniques that are appropriate in the circumstances and for which sufficient data are available to measure fair value **maximizing the use of relevant observable inputs** and minimizing the use of unobservable inputs."

82.    The primary valuation technique is the "market approach," which uses observed prices and other relevant information generated by market transactions involving identical or comparable assets.  *See* ASC 820-55-3A.  One method under the

---

[1] Unless otherwise noted, emphasis added throughout.

"market approach" is the method that AudioEye claimed to use in this case, whereby a technology license is valued based on prices paid for similar licenses or services in actual cash transactions.

**May 5 and 14, 2014 – First Quarter 2014 Results**

83.     On May 5, 2014, the Company issued a press release titled "**AudioEye, Inc. Expects First Quarter Revenue to More Than Quadruple to Over $1.0 Million vs. $0.2 Million in Prior Year Period[.] Annualized Revenue 'Run Rate' Exceeds $4.0 Million in Most Recent Quarter**" (emphasis in original) (the "5/5/14 Press Release").

84.     The 5/5/14 Press Release reported that the Company announced expected earnings for the first quarter 2014.  The expected revenue was in excess of $1.0 million for the first quarter 2014, which "represented a sequential increase in recognizable revenue of approximately 33% relative to revenue [from the same period the previous year]."

85.     The 5/5/14 Press Release quoted Defendant Nathaniel in stating the following:

> Revenue for the first fiscal quarter ended March 31, 2014 exceeded $1.0 million, an increase of more than 345% from prior-year quarterly revenue of $224,297. The annualized revenue 'run rate' in the first quarter exceeded $4 million. We reiterate our revenue guidance for the current year and believe the Company should achieve an annualized revenue 'run rate' of $8 million or higher within the next two quarters. Our proprietary patented technology is transforming the accessibility of Internet websites by significantly reducing the time and other resources that publishers must invest to become compliant with federal mandates.

86.     Aside from presenting financial figures and expectations, the 5/5/14 Press Release touted, *inter alia*, the following "key milestones" in the first quarter 2014:

> • Developed an enterprise and government sales pipeline that management believes will provide the necessary foundation to establish AudioEye as the leading solutions provider, thought

leader and largest producer in the multi-billion dollar technology accessibility compliance market.

- Developed revenue producing technology licensing contracts and launched sales activities within the behavioral healthcare, U.S. government and enterprise markets.

- Received $3.5 million of additional equity growth financing at the beginning of the quarter.

- Commenced the process and steps necessary to up list the Company's common stock to the NASDAQ Capital Market as soon as practicable.

- Named Paul Arena as AudioEye's Executive Chairman.

- Welcomed Sandy Purcell as the newest independent member of the Company's Board of Directors.

87.   On May 14, 2014, the Company filed a quarterly report for the three-month period ended March 31, 2014 on a Form 10-Q with the SEC ("1Q 2014 10-Q"), which was signed by Defendants Nathaniel and O'Donnell.

88.   Attached to the 1Q 2014 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Nathaniel and O'Donnell attesting to the accuracy of the 1Q 2014 10-Q.

89.   The Company's SOX certifications throughout the Relevant Period contained the following attestations:

1.   I have reviewed [the attached filing] of AudioEye, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and

cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.     designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.     evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.     disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.     All significant deficiencies and material weaknesses in the design or operation of internal control over financial

reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

90.   For the quarter, the 1Q 2014 10-Q reported the following figures as compared to the same period the previous year:

|  | 1Q 2014 | 1Q 2013 |
|---|---|---|
| **Total Revenue** | $1,032,886 | $224,297 |
| **Gross Profit** | $991,733 | $179,274 |
| **Total Operating Expenses** | $2,393,504 | $541,393 |
| **Net Loss** | $1,408,754 | $396,086 |

91.   The Company assured investors that its revenue from licensing figures complied with GAAP and applicable regulations.  Specifically, the 1Q 2014 10-Q stated the following multiple times (hereinafter referred to as the "Licensing Revenue Recognition Provision"):

Licensing revenues for intangible assets, including intellectual property such as patents and trademarks, are recognized when all applicable criteria have been met: (a) persuasive evidence of an existing arrangement; (b) *a fixed or determinable price*; (c) the delivery has occurred or service has been rendered; and (d) *the collectability of the sales price is reasonably assured*. Licensing revenues are recognized over the term of the contract or, in the case of a perpetual license, revenues are recognized in the period the criteria have been met. *In transactions where the Company engages in a non-cash exchange for a license of the Company for the license of the Company's customer, the Company follows ASC 985-605 and ASC 958-845-10*. The licenses received from

the Company's customers are sold, licensed or leased in a different line of business from the Company license delivered to the Company's customers in the exchange. ***The fair value of the technology or products exchanged or received is determinable within reasonable limits and used to determine vendor-specific objective evidence with the purpose to enhance product offerings for the sale or license to third parties***. ***The Company uses fair value guidance of the vendor-specific objective evidence of fair value ("VSOE") under ASC 985-605***. The contracts are then evaluated for commercial substance, including that the licenses received by the Company in the exchange are expected, at the time of the exchange, to be deployed and used by the software vendor and the value ascribed to the transaction reasonably reflects such expected use.

92.     With that established, the Company reported that it obtained $900,000 from four licensing deals (involving a single license).  This $900,000 was recognized as revenue and made up over 87% of the Company's first quarter 2014 revenue.  The 1Q 2014 10-Q stated the following about the licensing deals (hereinafter referred to as the "1Q 2014 Licensing Deals Provision"):

> For the three months ended March 31, 2014, the Company sold one license for cash of $225,000 and exchanged the same license to three other customers for licenses to their intellectual property. The three licenses exchanged were determined to meet the aforementioned criteria and were each recognized as revenue and intangible assets for $225,000 each for a total of $675,000.

93.     The Company further represented multiple times, in its 1Q 2014 10-Q, that its financial statements "have been prepared in accordance with the accounting principles generally accepted in the United States of America and the rules of the Securities and Exchange Commission."   Indeed, the 1Q 2014 10-Q explicitly stated, "[o]ur consolidated audited financial statements . . . are prepared in accordance with United States Generally Accepted Accounting Principles ('GAAP')."

94.     At the same time, the Company acknowledged that its disclosure controls and procedures "were not effective as of March 31, 2014 due to omissions of disclosures in accordance with generally accepted accounting principles," but also represented that such omissions "have been corrected as of May 14, 2014."

95.     The Company further represented:

*We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed* in our reports filed under the Securities Exchange Act of 1934, as amended, *is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management*, including our Principal Executive Officer and Principal Financial Officer, to allow for timely decisions regarding required disclosure.

### July 2, 2014 – 2Q 2014 10-Q Preliminary Results

96.     On July 2, 2014, the Company issued a press release titled, "**AudioEye to Report Profitable Second Quarter on Record Revenue of Approximately $3.0 Million[.] Second Quarter Revenue Increases Approximately 200% vs. $1.0 Million in First Quarter Revenue**" (emphasis in original) (the "7/2/14 Press Release").

97.     The 7/2/14 Press Release reported that the Company announced expected earnings for the second quarter 2014.   The Company announced "record operating results" of  "approximately $3.0 million in recognizable revenue for the three months ended June 30, 2014" compared to "approximately $0.2 million in the prior-year quarter."   The increase in revenue represented "an approximate 200% increase relative to revenue of $1.0 million in the quarter ended March 31, 2014."

98.     The 7/2/14 Press Release, quoting Defendant Nathaniel, stated

*Revenue growth is an indicator that we are achieving our mission as a team*.  The Company is on pace to exceed our previous revenue guidance of $8 million for the full year, and we believe AudioEye is in the early stages of the large-scale adoption of our technologies by federal, state and local governments in the U.S. and abroad.

99.     The 7/2/14 Press Release reported, *inter alia*, the following highlights for the second quarter 2014:

- The annualized revenue "run rate" for the most recent quarter approximated $12 million.

- Revenue for the first half of 2014 and 2013 approximated $4.0 million and $0.4 million, respectively.

- Management expects revenue to exceed the Company's previous guidance of $8 million for the year ending December 31, 2014.

- Approximately $1 million in contracts were secured with leading national health care companies.

- The Company executed licenses for its technology with organizations involved in the consumer packaged goods (CPG), retail and coupon, and online jobs posting verticals during the second quarter of 2014.

- Based on the information above, the Company is pleased to announce that it expects to be profitable for the quarter ended June 30, 2014.

100.    It would be over one month before the Company actually filed their financial statement for the second quarter 2014.  But before then, the Company decided to initiate an offering of Company common stock.

**July 30, 2014 – Registration of Securities**

101.    On July 30, 2014, the Company filed a Registration Statement on Form S-1 with the SEC, signed by Defendants Nathaniel and O'Donnell for themselves and on behalf of the entire Board at the time[2] (the "2014 Registration Statement").

102.    The 2014 Registration Statement was filed in connection with the registration of up to 5,701,334 shares of the Company's common stock, which were being registered in connection with the proposed sale of the shares by the selling stockholders identified therein (the "2014 Offering").  The shares offered as part of the 2014 Offering consisted of (i) 2,766,667 then outstanding shares of common stock and (ii) 2,934,067 shares of common stock issuable upon exercise of outstanding common stock purchase warrants.

---

[2] The Board at the time consisted of Defendants Nathaniel, Arena, Bettis, Coelho, Mellon, Purcell, and Withrow.

103.   The selling shareholders included Defendant Purcell, who sold 1,333,334 shares of Company common stock through the 2014 Offering, which represented 2.11% of all issued and outstanding Company common stock at the time.

104.   The 2014 Registration Statement contained financial information for the Company as well as a sleugh of other information about the Company and its business. The 2014 Registration Statement explained that one of the Company's "competitive strengths" was its licensing business model whereby it pursues agreements to license its technology within "key identified vertical end-markets."  This seemed to justify the extremely high percentage of total revenue reportedly derived from licensing transactions.

105.   The 2014 Registration Statement reported some of the same financial figures as the 1Q 2014 10-Q but in summary fashion.  It then stated that "[f]or the three months ended March 31, 2014 and 2013, revenue was $1,029,761 and $223,172, respectively, consisting primarily of revenues from *various levels of licensing*, website design and maintenance."

106.   Like previous filings, the 2014 Registration Statement represented that the Company's "accounting policies conform to accounting principles, generally accepted in the United States of America, and have been consistently applied in the preparation of the financial statements."

107.   The 2014 Registration Statement further reiterated the Company's commitment to its established revenue recognition policy, and stated the following about it:

> Revenue is recognized when all applicable recognition criteria have been met, which generally include (a) persuasive evidence of an existing arrangement; (b) fixed or determinable price; (c) delivery has occurred or service has been rendered; and (d) collectability of the sales price is reasonably assured. For software and technology development contracts the company recognizes revenues on a percentage of completion method based upon several factors including but not limited to (a) estimate of total hours and milestones to complete; (b) total hours completed; (c) delivery

of services rendered; (d) change in estimates; and (e) collectability of the contract.

108.    The Company also represented, in the 2014 Registration Statement, that "Revenue is recognized when services are performed and/or the project is completed. Certain contracts contain payment terms of 2-3 installments, which become due upon the completion of various stages of the project or service."

109.    Regarding licensing revenue, the Company made the identical representations made in the 1Q 2014 10-Q, including the Licensing Revenue Recognition Provision and the 1Q 2014 Licensing Deals Provision.

110.    The 2014 Registration Statement also disclosed that the Company sold almost 2.8 million unregistered securities for $830,000 on June 30, 2014.  In particular, it stated:

> On June 30, 2014, we sold an aggregate of 2,766,667 units to 3 accredited investors (who are part of the Selling Stockholders) for gross proceeds of $830,000 in a private placement (the "Private Placement"). The units in the Private Placement consisted of 2,766,667 shares of our common stock and warrants to purchase an additional 2,934,667 shares of common stock, which warrants include warrants to purchase 168,000 shares of our common stock issued to the placement agent in connection with their services. The warrants in the Private Placement are for a term of five years and have an exercise price of $0.40 per share.

111.    Notably, the 2014 Registration Statement represented that the Company was "dependent on certain members of [its] management and technical team" and stated the following (hereinafter referred to as the "Essential Officer Provision"):

> Investors in our common stock must rely upon the ability, expertise, judgment and discretion of our management and the success of our technical team in exploiting our technology. Our performance and success are dependent, in part, upon key members of our management and technical team, including **Nathaniel Bradley**, Chief Executive Officer and President, **Paul Arena**, Executive Chairman/Chairman of the Board, **Sean Bradley**, Chief Technical Officer, and **James Crawford**, Chief Operating Officer. The departure of such key persons could be detrimental to our

future success. Members of our management hold a significant percentage of our common stock. We cannot assure you that our management will remain in place. The loss of any of our management and technical team members could have a material adverse effect on our results of operations and financial condition, as well as on the market price of our common stock.

112.    Also notable, was the disclosure in the 2014 Registration Statement that Defendant Arena "is entitled to a quarterly bonus of up to $50,000 based on recognized revenues for the applicable quarter."  Moreover, Defendants Sean and Crawford were subject to a "Performance Share Unit Agreement" whereby they received awards based on the Company's performance.  Defendants Arena, Sean, and Crawford were additionally privy to the general Incentive Compensation Plans, which all officers, directors, employees, consultants and other persons who provide services to the Company were eligible for and contained "performance awards."  These compensatory arrangements only further provided the Individual Defendants with an incentive to inflate revenues.

113.    In response to a deficiency letter from the SEC, on August 8, 2014, the Company filed with the SEC an amended version of the 2014 Registration Statement, which also contained all of the aforementioned representations.

**August 8, 2014 – Prospectus for the 2014 Offering**

114.    On August 8, 2014, the Company filed a Prospectus, dated August 8, 2014, on Form 424B3 (the "2014 Prospectus") announcing the 2014 Offering. Defendants Nathaniel and O'Donnell wrote, adopted, and approved of the contents of the 2014 Prospectus.

115.    The 2014 Prospectus contained many of the same representations as the 2014 Registration Statement, including the Licensing Revenue Recognition Provision, the 1Q 2014 Licensing Deals Provision, and the Essential Officer Provision.

**August 11, 2014 – Second Quarter 2014 Results**

116.    On August 11, 2014, the Company filed a quarterly report for the three-

month period ended June 30, 2014 on a Form 10-Q with the SEC ("2Q 2014 10-Q"), which was signed by Defendants Nathaniel and O'Donnell.

117.    Attached to the 2Q 2014 10-Q were SOX certifications, signed by Defendants Nathaniel and O'Donnell, attesting to the accuracy of the 2Q 2014 10-Q.

118.    The Company represented multiple times that the 2Q 2014 10-Q was "prepared in accordance with accounting principles generally accepted in the United States of America and the rules of the Securities and Exchange Commission."

119.    Importantly, the Company represented that its disclosure controls and procedures were effective as of June 30, 2013.  Specifically, the Company represented the following about its disclosure controls and procedures:

> We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Principal Executive Officer and Principal Financial Officer, to allow for timely decisions regarding required disclosure.  Our management carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures.  ***Based on that evaluation, our Principal Executive Officer and Principal Financial Officer have concluded that our disclosure controls and procedures were effective as of June 30, 2014 in accordance with generally accepted accounting principles***.

120.    Indeed, the Company represented that it had made "improvements in [its] internal controls over financial reporting that occurred after the year ended December 31, 2013."  The Company further explained that "[i]n the first and second quarters of 2014, we remediated inconsistencies and omissions related to certain equity transactions by identifying potential issues in a timely manner and properly classifying those transactions by adding an additional layer of review to equity transactions."

121.    For the quarter, the 2Q 2014 10-Q reported the following figures as compared to the same period the previous year:

|  | 2Q 2014 | 2Q 2013 |
|---|---|---|
| **Total Revenue** | $3,013,033 | $200,232 |
| **Gross Profit** | $2,678,721 | $149,465 |
| **Total Operating Expenses** | $1,676,639 | $679,166 |
| **Net Loss** | Gain of $1,001,621 | $529,701 |

122.    The 2Q 2014 10-Q contained the Licensing Revenue Recognition Provision and even added the following:

> In transactions where the Company engages in a non-cash exchange of a license of the Company for the services of the Company's customer, the Company follows Accounting Standards Codification ("ASC") 985-605 and ASC 985-845-10. The fair value of the technology or services exchanged or received is determined within reasonable limits and used to determine vendor-specific objective evidence. The Company uses fair value guidance of the vendor-specific objective evidence of fair value ("VSOE") under ASC 985-605. The revenue under these transactions is recognized upon delivery of the license and the services received in exchange are recognized as a prepaid asset that is amortized to expense as the services are received. The Company evaluates whether the period over which the services are received requires treatment as extended payment terms under ASC 985-605-25-33 and the Company evaluates the collectibility of the services to be received under ASC 985-605.

123.    For the quarter, the Company reported revenue from licensing deals of $2,925,000 or *over 97% of total revenue for the quarter*.   Specifically, the 2Q 2014 10-Q represented the following:

> For the three and six months ended June 30, 2014, the Company sold an aggregate of thirteen and seventeen licenses, respectively for $225,000 per license and exchanged the license with its customers for either a license to their intellectual property or prepaid services. The thirteen and seventeen licenses exchanged were determined to meet the

aforementioned criteria. During the three and six months ended June 30, 2014, nonmonetary revenue of $2,925,000 and $3,825,000, respectively, was recognized. This resulted in an increase to intangible assets and prepaid expenses of $675,000 and $3,150,000, respectively.

124.    Regarding the sale of unregistered securities, the 2Q 2014 10-Q disclosed the following:

From April 1, 2014 through June 30, 2014, we issued 1,071,915 shares of common stock for services for an expense of $354,828 with no future period amortization.

On June 30, 2014, we sold an aggregate of 2,766,667 units to three accredited investors for gross proceeds of $830,000 in the third closing of a private placement (the "Third Private Placement"), $60,000 of which was paid for on July 14, 2014 and booked as a stock subscription receivable as of June 30, 2014. Placement fees of $55,848 were paid, including placement agent warrants to purchase 168,000 shares of our common stock,  and *we received net proceeds of $771,152*, which are being used for general working capital purposes. The units in the Third Private Placement consisted of 2,766,667 shares of our common stock and warrants to purchase an additional 2,766,667 shares of our common stock.  The warrants in the Third Private Placement have a term of five years and an exercise price of $0.40 per share.

### November 7, 2014 – Third Quarter 2014 Results

125.    On November 7, 2014, the Company filed a quarterly report for the three-month period ended September 30, 2014 on a Form 10-Q with the SEC ("3Q 2014 10-Q"), which was signed by Defendants Nathaniel and O'Donnell.

126.    Attached to the 3Q 2014 10-Q were SOX certifications, signed by Defendants Nathaniel and O'Donnell, attesting to the accuracy of the 3Q 2014 10-Q.

127.    The Company represented multiple times that the 3Q 2014 10-Q was "prepared in accordance with accounting principles generally accepted in the United States of America and the rules of the Securities and Exchange Commission."

128.    The Company also represented that its disclosure controls and procedures were effective as of June 30, 2013.  Specifically, the Company represented the following

44

about its disclosure controls and procedures:

> We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Principal Executive Officer and Principal Financial Officer, to allow for timely decisions regarding required disclosure.  Our management carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures.  ***Based on that evaluation, our Principal Executive Officer and Principal Financial Officer have concluded that our disclosure controls and procedures were effective as of September 30, 2014 in accordance with generally accepted accounting principles***.

129.    Indeed, the Company made the same representations as in the 2Q 2014 10-Q regarding improvements made to the internal controls over financial reporting.

130.    For the quarter, the 3Q 2014 10-Q reported the following figures as compared to the same period the previous year:

|  | 3Q 2014 | 3Q 2013 |
|---|---|---|
| **Total Revenue** | $4,837,411 | $381,539 |
| **Gross Profit** | $3,752,423 | $250,768 |
| **Total           Operating Expenses** | $2,437,906 | $1,096,811 |
| **Net Loss** | Gain of $1,302,101 | $870,810 |

131.    The 3Q 2014 10-Q contained the Licensing Revenue Recognition Provision and the additional portion added to the 2Q 2014 10-Q.

132.    For the quarter, the Company reported revenue from licensing deals of

$4,275,000 or **over 88% of total revenue for the quarter**.   Specifically, the 3Q 2014 10-Q represented the following:

> For the three and nine months ended September 30, 2014, the Company sold an aggregate of nineteen and thirty-six licenses, respectively, with a fair value of $225,000 per license, in exchange for either a license to their intellectual property or prepaid services. The licenses exchanged were determined to meet the aforementioned criteria. During the three and nine months ended September 30, 2014, nonmonetary revenue of $4,275,000 and $8,100,000, respectively, was recognized. This resulted in an increase to intangible assets and prepaid expenses of $2,025,000 and $6,075,000, respectively.

133.   Regarding the sale of unregistered securities, the 3Q 2014 10-Q disclosed shocking news.  The Company, despite reportedly reaching record-level revenues and gross-profits and unprecedented income levels, was providing incentives for the public to purchase stock from the Company through the exercise of warrants.  The 3Q 2014 10-Q disclosed that in July 2014, the Company offered "holders of a series of [its] warrants . . . the opportunity to exercise their warrants for a 10% discount to the stated exercise price in exchange for their agreement to exercise their warrants in full and for cash on or before July 31, 2014."   As one may expect given the numbers the Company was reporting, the public responded well to the Company's offer.

134.   Under the warrant exercise offer, in July 2014 the Company issued 10,027,002 shares of common stock for gross proceeds of $3,632,801 and net proceeds of $3,501,521 after investment banking fees of $131,280.

135.   The Defendants used the inflated price of the Company's stock to egregiously take advantage of the public, and dilute shareholders' interests.   The Company reported the following transactions in the 3Q 2014 10-Q:

> From July 1, 2014 through September 30, 2014, we also issued 515,000 shares of common stock for services valued at $382,300 with no future period amortization.

46

In September 2014, we issued 20,000 shares of common stock pursuant to the exercise of 20,000 warrants at a strike price of $0.50 for proceeds of $10,000.

On July 17, 2014, we issued five-year warrants to purchase 25,000 shares of common stock that vest over twelve months and have an exercise price of $0.85 per share for payment for services.

On August 25, 2014, we issued warrants to purchase 500,000 shares of common stock. The warrants vest as follows: one warrant share for every $10 of gross sales by us during the 12-month period immediately following the date of grant to customers introduced by the warrant holder. The warrants have an exercise price of $0.60 per share and an expiration date of August 25, 2017.

On August 27, 2014, we issued three-year fully-vested warrants to purchase 15,000 shares of common stock with an exercise price of $0.65 per share for payment for services.

On August 29, 2014, we issued three-year fully-vested warrants to purchase 53,036 shares of common stock with an exercise price of $0.70 per share for payment for services.

On September 5, 2014, we issued five-year warrants to purchase 500,000 shares of common stock that vest over three years and have an exercise price of $0.79 per share for payment for services.

On September 30, 2014, we sold an aggregate of 700,000 units to two accredited investors for gross proceeds of $350,000 in the closing of a private placement (the "Summer Private Placement"), which are being used for general working capital purposes. The units in the Summer Private Placement consisted of 700,000 shares of our common stock and warrants to purchase ¼ of a share for every share purchased or an additional 175,000 shares of our common stock. The warrants in the Summer Private Placement have a term of five years and an exercise price of $0.60 per share.

**December 3, 2014 – SEC Inquiry**

136.    On December 3, 2014, the SEC sent a deficiency letter to Defendant O'Donnell, which was signed by Stephen Krikorian, the Accounting Branch Chief for the SEC (the "12/3/14 Deficiency Letter").

137.    The 12/3/14 Deficiency Letter raised issues regarding the lack of clarity

and/or missing information in the 2013 10-K and 3Q 2014 10-Q.  Regarding the latter, the 12/3/14 Deficiency Letter asked for the Company's "consideration of providing additional disclosures identifying [certain non-cash exchanges] as being non-cash in a table."  But the next two items in the 12/3/14 Deficiency Letter were critical.

138.    The 12/3/14 Deficiency Letter inquired deeply into the Company's non-cash transactions and certain irregularities seen by the SEC in connection with such reported transactions.  Specifically, the 12/3/14 Deficiency Letter stated the following:

> Please address the following items related to your transactions where you engage in a non-cash exchange of a license of the Company for the license of your customer.
>
> - Clarify the types of licenses that you are exchanging with your customer.
>
> - Provide us with an example of a typical transaction. In this regard, we note your disclosure that the licenses received from your customers are sold, licensed or leased in a different line of business from the Company license delivered to the Company's customers in the exchange.
>
> - Your disclosure indicates that licenses received from your customers are sold, licensed or leased in a different line of business. Please clarify how you make the determination that a company is in a different line of business.
>
> - Please clarify why you do not record licenses at historical cost in transactions where you engage in a non-cash exchange of a license for the license of a customer. Refer to FASB ASC 985-845-55-1.
>
> - Your disclosure on page 1 of your Form 10-K for the year ended December 31, 2013 indicates that you generate revenues through the sale of your software as a service (SaaS) technology platform. ***As such, it does not appear that you sell licenses as part of your regular business. Please tell us how you determined that ASC 985-605 and ASC 985-845-10 are the appropriate guidance for these non-cash exchanges***

*of licenses. Similarly, tell us the guidance considered to present these non-cash exchanges as revenue rather than other income.*

- *Given that it does not appear that you sell licenses in your day to day operations, explain in sufficient detail how you determined the fair value of the licenses involved in the exchange.*

We note that you engage in transactions that involve a non-cash exchange of a license of the Company for the services of your customer. Please address the following items:

- Explain the type of services that you receive from your customer. Clarify if services are received from more than one customer.

- *Explain how you determined that the non-cash exchange of a license for services should be accounted under ASC 985-605 and ASC 985-845-10.*

- Clarify the types of licenses that you are exchanging with your customer.

- As noted in the comment above, it appears that your primary business is the sale of software as a service (SaaS) technology platform. *Tell us the guidance considered to present these non-cash exchanges as revenue rather than other income.*

- *Given that it does not appear that you sell licenses in your day to day operations, explain in sufficient detail how you determined the fair value of the technology and services exchanged and received.*

139.  The SEC felt it necessary to remind the Company's management that it was responsible for the accuracy and adequacy of the Company's filings.  Specifically, the SEC stated the following:

> We urge all persons who are responsible for the accuracy and adequacy of the disclosure in the filing to be certain that the filing includes the information the Securities Exchange Act of 1934 and all applicable Exchange Act rules require.

49

Since the company and its management are in possession of all facts relating to a company's disclosure, they are responsible for the accuracy and adequacy of the disclosures they have made.

140.    The SEC required the Company to provide a written statement acknowledging that (1) the company is responsible for the adequacy and accuracy of the disclosure in the filing, (2) staff comments or changes to disclosure in response to staff comments do not foreclose the Commission from taking any action with respect to the filing, and (3) the company may not assert staff comments as a defense in any proceeding initiated by the Commission or any person under the federal securities laws of the United States.

141.    In a letter to Mr. Krikorian at the SEC, dated December 15, 2015, the Company responded to each of the SEC's requests for information.  This would not end the inquiry, however.

**January 12, 2015 – Fourth Quarter 2014 Preliminary Results**

142.    On January 12, 2015, the Company issued a "corrected press release announcing its preliminary results of operations for its fourth quarter and year ended December 31, 2014," which was titled "**AudioEye to Report Profitable 2014 and Fourth Quarter Revenues of $3.25 Million[.] Company Anticipates Becoming Operating Cash Flow Positive in First Quarter of 2015**" (emphasis in original) (the "1/12/15 Press Release").

143.    The 1/12/15 Press Release, quoting Defendant Nathaniel, stated:

We are very excited that we have access to more capital than at any time in our history and look forward to becoming operating cash flow positive in the first quarter of 2015, which is a triumph for our team. We are also pleased to announce the completion of a ***$2.675 million private placement*** and express our gratitude to all of our shareholders, without which AudioEye's opportunities would not be so robust and scalable.  The proceeds from the equity raise and our cash revenue from sales will be reinvested into supporting our team's initiative of becoming the global leader in web accessibility.  We are focused intently on growth and

leveraging our accomplishments in 2014 with even greater success in 2015.

144.   As seen above, the Company touted its newest private placement, which was closed after the SEC began its investigation of the Company's reporting.  In the subject private placement, the Company sold 7,500,000 shares of the Company's common stock and warrants to purchase an additional 3,172,501 shares of common stock for gross proceeds of *$3 million*.

145.   The Company reported, *inter alia*, the following highlights for the fourth quarter 2014:

- Bookings for the third and fourth quarters of 2014 approximated $5.3 million and $4.7 million, respectively. Approximately $1.0 million, or 19% of total third quarter bookings represented cash contracts, and $2.46 million, or 52% of total fourth quarter bookings consisted of cash contracts, an increase of 146%.

- AudioEye recently closed on a private placement of equity consisting of 6,687,500 units, which generated gross proceeds to the Company of approximately $2.675 million.

- The Company expects to report at least $3.25 million in revenue for the three months ended December 31, 2014. This compares with approximately $0.75 million in the prior-year quarter, representing a year-over-year increase of more than 332%. Revenue for the twelve months ended 2014 and 2013 approximated $12 million and $1.56 million, respectively, representing a year-over-year increase of more than 665%. Based on information currently available, the Company expects to be profitable for the year ended December 31, 2014.

- Monetary contracts executed as a result of the Company's intellectual property licensing strategy increased more than 140%, from $1 million in the third quarter of 2014 to over $2.4 million in the fourth quarter of 2014.

- Recognized cash revenue for the three months ended December 31, 2014 totaled over $1 million, representing an increase of more than 81% relative to cash revenue of $0.56 million for the quarter ended September 30, 2014.

- The annualized bookings "run rate" for the most recent quarter exceeded $18 million.

- Anticipated operating receipts of cash payments of over $2 million at the beginning of the first quarter of 2015 should result in cash on hand in excess of $4 million, the strongest cash position to begin any year in the Company's history.

- Projected and budgeted expenses for the first quarter of 2015 should be exceeded by cash inflows from operations. As a result, management believes that AudioEye will become operating cash flow positive during the quarter ending March 31, 2015.

**January 16- March 24, 2015 – The SEC Investigation Heats Up**

146.    As mentioned above, the Company responded to the 12/3/14 Deficiency Letter in a letter dated December 15, 2014 (the "12/15/14 Response").  The 12/15/14 Response was insufficient to address the SEC's concerns.  Nevertheless, in the 12/15/14 Response, Defendant O'Donnell represented, on behalf of the Company, that "[t]he fair value of the technology or services exchanged or received is determined within reasonable limits . . . ."

147.    In a letter written by Mr. Krikorian to the Company dated January 16, 2015 (the "1/16/15 Deficiency Letter"), the SEC noted several continuing defects and inconsistencies with the Company's filings and their 12/15/14 Response.

148.    The 1/16/15 Deficiency Letter, in meticulous detail, pointed out the defects in the 12/15/14 Response and requested more information.  Specifically, the SEC stated the following in its 1/16/15 Deficiency Letter:

- Your response to prior bullet point 5 indicates that you are following software revenue recognition guidance through analogy. For each of these licenses, explain in greater detail how you determined that these arrangements are within the scope of the software revenue recognition guidance. Refer to the guidance in FASB ASC 985-605-15-1 through 15-4.

- Your response in prior bullet point 6 indicates that you relied upon FASB ASC 985-605-25-6 to establish the price. However, this guidance applies to allocating fees within multiple-element

arrangements, and thus, does not appear to apply to your current situation as you have not had any monetary transactions at this price. Please advise.

- It remains unclear to us how you determined the fair value of the licenses involved in the exchange. Your response states that you have sold one license, which was subsequently accounted for as a non-monetary exchange. We also note your response to prior bullet point 1, that you have a patent portfolio comprised of six issued patents. As such, it does not appear that you have had any standalone transactions for any of your licenses that would support VSOE. Please advise.

- Please provide us with your analysis of each of these licenses that supports the culmination of the earnings process by demonstrating: 1) the software received is to be sold in a different line of business from the software provided in the exchange, 2) VSOE of fair value of the product received or exchanged exists and 3) commercial substance. Refer to FASB ASC 985-845-55-1.

- Your response to prior bullet point 5 indicates that you do not consider intellectual property licensing of non-cash exchanges to be outside of your regular business. However, it does not appear that you have licensed any of your licenses to date for cash proceeds. As such, it is unclear how you would consider this to be your normal product. Please provide further detail.

149.     In sum, the SEC was perplexed how the Company, which had no basis for assessing fair value of its licenses, was valuing its technology licenses as they were and reporting transactions involving those licenses as revenue.

150.     The Company responded to the 1/16/15 Deficiency Letter by letter dated February 6, 2015 (the "2/6/15 Response").   In the 2/6/15 Response, Defendant O'Donnell admitted to "oversight" in the 12/15/14 Response, and he blatantly misrepresented the Company's basis for "fair value" of its licenses.

151.     Meanwhile, on March 5, 2015, Defendant Arena entered into a separation agreement with the Company, cutting short his two-year employment contract and stepping down as Executive Chairman/Chairman of the Board and a Company director.

152.     Mr. Krikorian of the SEC responded to the Company's 2/6/15 Response by

letter dated March 12, 2015 (the "3/12/15 Deficiency Letter").  The 3/12/15 Deficiency Letter continued to find issues with the Company's responses, including Defendant O'Donnell's representation that the Company had a basis for determining "fair value." Moreover, the SEC noted how the Company was not providing clarification on the relevant issues.  In particular, the 3/12/15 Deficiency Letter noted, *inter alia*, the following:

> ***It continues to remain unclear*** how you determined to follow software revenue recognition guidance for these non-cash exchanges, specifically in those exchanges for the services of your customer. In this regard the guidance in FASB ASC 985-845 refers and applies specifically to exchanges of software for software. As such, it would appear that for those exchanges for the services of your customer, FASB ASC 845 is the applicable guidance. Please advise.

153.    The Defendants were caught in their tracks.  On March 24, 2015, the Company sent a letter to Mr. Krikorian, this time from Defendant Nathaniel, explaining that it did not have a response to the 3/12/15 Deficiency Letter at that time but would respond by April 3, 2015.

154.    Several days later, on March 29, 2015, Defendant O'Donnell stepped down from his position as the Company's CFO.  With that, two "essential" officers left the Company in a single month.

### April 1, 2015 – The Truth Begins to Surface

155.    On April 1, 2015, the Company filed a Form 8-K with the SEC, signed by Defendant Nathaniel, (the "4/1/15 8-K"), which attached a press release issued the same day.

156.    The 4/1/15 8-K explained that on March 26, 2015, the Company concluded that it had to restate its 1Q 2014 10-Q, 2Q 2014 10-Q, and 3Q 2014 10-Q. The Company cautioned investors, stating that "investors should no longer rely upon the Company's previously released financial statements or other financial data for these periods, including any interim period financial statements, and any earnings releases

relating to these periods."   Moreover, the Company further warned against reliance on "the preliminary earnings release issued by the Company on January 12, 2015 relating to the quarter and year ended December 31, 2014."

157.   The Company's misrepresentations and violations of law were revealed to be pervasive and to have far-reaching consequences.   The Company anticipated "removing all revenue derived from non-cash exchanges of a license of the Company for the license of the Company's customer and all revenue from non-cash exchanges of a license of the Company for services of the Company's customer, and reducing by a material amount previously reported license cash revenue."   The Company explained that the "reversal of revenue on the non-cash exchange transactions will also impact additional accounts including reductions in Prepaid Assets, Intangible Assets and Amortization Expense" and that certain expenses will be reclassified.

158.   In all, the aggregate amount of revenue reported for the first nine months of 2014 for non-cash transactions was approximately *$8.1 million*.

159.   Thus, the Company suggested that it had insufficient – or more likely no amount of – support for the value attributed to each of its reported 36 licensing transactions, which comprised 92% of the Company's total reported revenue during the first nine months of 2014.

160.   Moreover, the Company finally agreed to be truthful about its internal controls and from there on expected to report "material weaknesses in the Company's internal controls" and that "internal controls over financial reporting and disclosure controls are not effective."

161.   Finally, the Company announced that it did not expect "to timely file its Form 10-K for calendar year 2014 or its Form 10-Q for the quarter ended March 31, 2015."   The same day, the Company filed a Notification of Late Filing on Form 12b-25, signed by Defendant Nathaniel, announcing that the Company could not file its Forms 10-K for the period ended December 31, 2015.   The Company explained the following

reasons for its failure:

> **AudioEye, Inc. (the Company") is unable to file its Annual Report on Form 10-K (the "Form 10-K") for the year ended December 31, 2014 within the prescribed time period without unreasonable effort or expense. The Company requires additional time to prepare its financial statements to be filed as a part of the Form 10-K because the Company is working to finalize its previously disclosed restatements of its previously issued financial statements for its quarters ended March 31, June 30 and September 30, 2014 for the reasons set forth in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 1, 2015, which is incorporated herein by reference.**
>
> **The Company is unable to provide a reasonable estimate of its results of operations for its fiscal year ended December 31, 2014 for the reasons set forth in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 1, 2015.**

(Emphasis in original.)

162.   On this news, the price of AudioEye stock plummeted over 10 cents or 24%, falling from a close of $0.41 per share on April 1, 2015 to a close of $0.31 on April 2, 2015, on unusually heavy trading volume.  By April 21, 2015, the price of the Company's common stock had dropped to close at less than $0.10.

### April 27, 2015 – Officers and Directors Jump Ship

163.   On April 27, 2015, the Company filed a Form 8-K, attaching a press release, that announced the departure of three Company officers and/or directors. Specifically, it announced that effective April 21, 2015, Defendant Mellon resigned as a Company director, effective April 24, 2015, Defendant Nathaniel resigned as CEO and President of the Company, and Defendant Crawford resigned as COO and Treasurer of the Company.   These departures signaled a looming revelation of a skeleton-filled closet.   And even worse, it was the second time that two "essential" officers left the Company in the same month – this time the very same day.

**May 18, 2015 – Restated Financial Results**

164.    On May 18, 2015, the Company filed restated financial statements for the first, second, and third quarters of 2014 (the "Restatements").

165.    Before reporting amended financials, the Restatements explained the errors in the original financial statements and the reason therefore.  In particular, the Company explained the following:

> [I]n conjunction [with] certain changes in the management of the Company, as well as during the course of an internal review initiated by the Audit Committee at the Board of Directors during the first quarter and into the second quarter of 2015 ("Internal Review") *the Company identified errors in the application of the accounting principles for revenue recognition and costing of non-monetary transactions* related to its intellectual property portfolio. Specifically, *the Company had no prior cash sales of licenses of its patents as of March 31, 2014*. To recognize revenue on a non-monetary exchange of a license of its patents for services or licenses to be provided by a counterparty, the Company looked to establish fair value of either the licensed patents or the services or licenses to be received. Based on the nature of the transactions, and after consultation with the Company's auditors and another outside accounting firm, the Company applied ASC 845-10-30-1, holding that fair value of the services or licenses it would receive in each transaction was more clearly evident than the fair value of the asset surrendered.  This methodology was approved by Company's auditors and another outside accounting firm; this is the correct methodology, and it was the methodology used by the Company.

> Under ASC 845, fair value in a license-for-services or license-for-license contract in which the cost of the asset being surrendered is not determinable can rely on the fair value of the asset received if it is determinable. The subsequent licenses for services or licenses transactions, as such, might have in the alternative considered the fair value of the services or licenses being provided by the counterparties. However, *the Company has now determined following its Internal Review that in applying this methodology it did not have sufficient support to establish the value of the services or licenses provided under the subsequent license-for-services or license-for-license transactions, did not adequately track the consulting services provided by the various counterparties, and did not have sufficient support to establish such services were actually provided as per the terms of the contracts*.

\*\*\*

The restatement also reflects that the Company discovered following its Internal Review errors associated with the timing of revenues recognized under certain contracts in terms of the percentage of completion methodology.  In such cases, ***the Company has now learned that it did not maintain sufficient documentation to measure the production activities necessary for such computation***.

Finally, the Company discovered, following its Internal Review, errors which impacted revenues recognized ***where collection of the sales price was not reasonably assured***.

\*\*\*

Following its Internal Review, the Company has determined that ***these errors resulted from material weakness in internal control over financial reporting*** as discussed under Part 1, Item 4.  In particular, the Company concluded that there was a misapplication of relevant accounting guidance and ***the absence of documentation to support transactions including the failure to trace the delivery of services***.

166.    Accordingly, the Restatements erased all $8.1 million of misrecognized revenue.

### **Summary of the Individual Defendants' Wrongful Conduct**

167.    In breach of their fiduciary duties as officers and/or directors of the Company, the Individual Defendants knowingly or recklessly caused the Company's financial statements to violate GAAP in that they failed to appropriately calculate revenue from non-cash transactions, and instead improperly reported $8.1 million in revenue from licensing transactions without an appropriate documentary or other basis to do so.

168.    In breach of their fiduciary duties as officers and/or directors of the Company, the Individual Defendants knowingly or recklessly caused the Company to fail to maintain adequate internal review processes, disclosure controls, auditing processes, and internal control over financial reporting.

169.    In breach of their fiduciary duties as officers and/or directors of the

Company, the Individual Defendants knowingly or recklessly caused the Company to hire individuals and appoint directors without appropriate agreements in place to prevent high turnover at the Company, which caused considerable waste of Company resources. Indeed, given the Company's statements in the Essential Officer Provision, the Company suffered substantial damage when the Company's top officers, including Defendants Nathaniel, O'Donnell, Sean, Crawford, and Arena stepped down from their officer positions within a period of 18 months. In fact, no fewer than six directors and/or executive officers resigned from their positions with the Company and/or the Board within 18 months. And indeed, the Company's premature separation from Defendant Arena cost the Company considerable resources in the form of hundreds of thousands of dollars, if not millions of dollars, worth of stock. These departures of officers and/or directors were due to the conditions that the Individual Defendants allowed to exist at the Company. The Company had insufficient safeguards in place to insulate itself from harm caused by the departure of such officers and/or directors, essentially *en masse*.

170.    Moreover, as shown through the Company's statements described above, in breach of their fiduciary duties owed to AudioEye, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact regarding, at least, (1) the Company's total revenue and revenue from licensing transactions; (2) the Company's gross profit, net income, and other financial figures affected by revenue; (3) the Company's compliance with applicable regulations, (4) the Company's compliance with GAAP, (5) the Company's reckless nominating practices that caused high turnover at the Company, (6) the Company's maintenance of disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and

communicated to the Company's management to allow for timely decisions regarding required disclosure, and (7) the effectiveness of the Company's internal controls and review procedures.  These facts pertained to the Company's business, operations, and prospects and were known to the Individual Defendants or recklessly disregarded by them.

171.    Finally, in breach of their fiduciary duties owed to AudioEye, the Individual Defendants willfully or recklessly caused the Company to sell 21,325,473 shares of Company common stock and warrants to purchase Company common stock for gross proceeds of over ***$7.9 million*** during the period of time when the price of the Company's common stock was artificially inflated due to the Company's and the Individual Defendants' misconduct as described herein.  At the same time Defendant Purcell sold 2.11% of the Company's outstanding stock in the 2014 Offering.  The Individual Defendants used the Company's proceeds of these fraudulent sales to increase their salaries, bonuses and Company stock holdings.

172.    In breach of their fiduciary duties, the Individual Defendants also failed to take appropriate remedial measures to ensure that the misconduct described herein cannot occur again, and have not brought suit to hold those responsible for misconduct accountable for their actions and the damage they caused to the Company.

## DAMAGES TO AUDIOEYE

173.    As a direct and proximate result of the Individual Defendants' conduct, AudioEye will lose and expend many millions of dollars.

174.    Such expenditures include, but are not limited to, legal fees associated with the securities fraud class action filed against the Company, Defendants Nathaniel and O'Donnell, and amounts paid to outside lawyers, accountants, and investigators in connection thereto, and losses of revenues caused by customers' loss of trust in the Company's business and products.

175.    Such expenditures will also include costs incurred in any internal

investigations pertaining to breaches of fiduciary duty and violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

176.   Such expenditures also include, but are not limited to, unwarranted compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, especially when those benefits were tied to the performance of the Company.

177.   As a direct and proximate result of the Individual Defendants' conduct, AudioEye has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

178.   Plaintiff brings this action derivatively and for the benefit of AudioEye to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of AudioEye and unjust enrichment, as well as the aiding and abetting thereof.

179.   AudioEye is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

180.   Plaintiff is, and at all relevant times has been, an AudioEye shareholder. Plaintiff will adequately and fairly represent the interests of AudioEye in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

181.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

182.   A pre-suit demand on the Board of AudioEye is futile and, therefore, excused.  At the time of filing of this action, the Board consisted of Zyngier and Griffin (the "Post Relevant Period Directors"), and Defendants Bettis, Purcell, Coelho (collectively and together with the Post Relevant Period Directors, the "Current Directors").  Plaintiff needs only to allege demand futility as to three of the five Current Directors that are on the Board at the time this action is commenced.

183.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make the false and misleading statements and omissions of material fact alleged herein and/or the other schemes described herein, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

184.   In complete abdication of their fiduciary duties, the Current Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements and/or omissions alleged herein and/or the other schemes described herein.  The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors.  As a result of the foregoing, the Current Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

185.   Additional reasons that demand on Defendant Bettis is futile follow. Defendant Bettis is employed by the Company as the Executive Chairman/Chairman of the Board, and is thus, as the Company admits, a non-independent director.  Defendant Bettis was a Company director throughout the Relevant Period and knowingly or recklessly engaged in and/or facilitated the commission of all the schemes described herein.  His large Company stock holding, worth at least $3.96 million during the

Relevant Period, reveals his interest in keeping the Company's stock price as high as possible. As a director and a Company officer, Defendant Bettis conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes alleged herein, including to make false and misleading statements and omissions and to violate GAAP, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Bettis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

186. Additional reasons that demand on Defendant Purcell is futile follow. Defendant Purcell was a Company director throughout the Relevant Period and knowingly or recklessly engaged in and/or facilitated the commission of all the schemes described herein. As Chairman of the Audit Committee, Defendant Purcell is especially culpable for the wrongful conduct described herein, including the failure of the Company to follow GAAP, the Company's issuance of false and misleading statements and omissions of material fact, and the lack of adequate internal controls. Additionally, Defendant Purcell sold more than *1.3 million* shares of Company common stock through the 2014 Offering, which represented 2.11% of all issued and outstanding Company common stock at the time, on material non-public information while the price of the Company's common stock was artificially inflated. His large Company stock holding, worth at least $1.8 million during the Relevant Period,[3] reveals his interest in keeping the Company's stock price as high as possible. As a director and Chairman of the Audit Committee, Defendant Purcell conducted little, if any, oversight of the Company's

---

[3] Defendant Purcell owned approximately 4,456,919 shares as of June 10, 2015. Given that the price per share of the Company's common stock at the close of trading on March 31, 2015, the day before the Individual Defendants' scheme was exposed, was $0.41, Purcell owned at least $1.8 million worth of AudioEye stock.

internal controls over public reporting of financial statements and of the Company's engagement in the schemes alleged herein, including to make false and misleading statements and omissions and to violate GAAP, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.   Thus, for these reasons, too, Defendant Purcell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

187.    Additional reasons that demand on Defendant Coelho is futile follow. Defendant Defendant Coelho was a Company director almost throughout the Relevant Period and knowingly or recklessly engaged in and/or facilitated the commission of all the schemes described herein.   His large Company stock holding, worth at least $267,500 during the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible.  As a director, Defendant Coelho conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes alleged herein, including to make false and misleading statements and omissions and to violate GAAP, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.   Thus, for these reasons, too, Defendant Coelho breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

188.    Additional reasons why demand on the Post Relevant Period Directors Zyngier and Griffin is futile follows.   The Post Relevant Period Directors were appointed to the Board by interested and non-independent Directors, and are thus also themselves non-independent.   AudioEye does not follow the standard practice of allowing shareholders to elect board members to fill vacancies on the Board; instead the

Board has complete control over such decisions. Indeed, according to the 2014 Registration Statement, the Company's certificate of incorporation "provides that any newly created directorships resulting from any increase in the authorized number of directors or any vacancies . . . will be filled solely by the affirmative vote of a majority of the remaining directors then in office, even though less than a quorum of the board." And it was through this method that the Post Relevant Period Directors were chosen. Moreover, the Individual Defendants that remained with the Company after April 1, 2015 and the Post Relevant Period Directors wrongfully failed to take appropriate remedial measures to ensure that the misconduct described herein cannot occur again, and to bring suit to hold those responsible for misconduct accountable for their actions and the damage they caused to the Company.

189. The Company essentially reorganized its Board between March and September of 2015, as some of the schemes were nearing their end. Before the reorganization, the Board consisted of the following seven Individual Defendants: Nathaniel, Arena, Bettis, Purcell, Coelho, Withrow, and Mellon (the "Former Directors").

190. The Current Directors and the Former Directors are collectively referred to herein as the Directors.

191. Three of the seven Former Directors are among the five Current Directors.

192. Alternatively, Plaintiff pleads demand futility due to his alleging that four of the seven Former Directors, who were on the Board at the time the accounting violations were made and the materially false and misleading statements were disseminated, breached their fiduciary duties by abandoning the Company when they resigned as Company directors between March and September of 2015 in order to insulate themselves from shareholder derivative claims ("Former Directors Who Abandoned The Company").

193.    The Former Directors Who Abandoned The Company are Defendants Nathaniel, Arena, Withrow, and Mellon.

194.    Courts hold that such clever conduct engaged in by the Former Directors Who Abandoned The Company establishes an exception to the requirement to plead that demand on directors who were appointed after wrongdoing occurred is futile.

195.    Indeed, the Former Directors Who Abandoned The Company breached their fiduciary duties by, in the wake of public exposure of the Company's accounting violations, collectively resigning over several months in order to insulate themselves from shareholder derivative claims.  Instead of endeavoring to recover on behalf of the Company the damages the Company suffered and will suffer from those responsible for fraud and manipulation, they dropped out.  By collectively resigning they expected to receive get-home free tickets.

196.    For the foregoing reasons, demand is excused because Courts do not permit directors who breached their fiduciary duties to defeat demand futility allegations by collectively resigning from and abandoning the company to which they owe allegiance.

197.    Additional reasons that demand on the Board is futile follow.

198.    The Directors, as members of the Board, were and are subject to the Code of Ethics.  The Code of Ethics go well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code of Ethics require the Directors to also adhere to AudioEye's standards of business conduct.  The Code of Ethics requires all employees, officers and directors to avoid activities or relationships that conflict with the Company's interests or adversely affect the Company's reputation.  The Directors did not comply with the requirements of the Code of Ethics.  Because the Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

199.    The Directors have longstanding business and personal relationships with

each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

200. AudioEye has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for AudioEye any part of the damages AudioEye suffered, and will continue to suffer, thereby. Thus, any demand on the Directors would be futile.

201. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

202. The acts complained of herein constitute violations of fiduciary duties owed by AudioEye's officers and directors, and these acts are incapable of ratification.

203. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of AudioEye. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought

directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."   As a result, if the Directors were to sue themselves or certain of the officers of AudioEye, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

204.   If there is no directors' and officers' liability insurance, then the Directors will not cause AudioEye to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.   Accordingly, demand is futile in that event, as well.

205.   Thus, for all of the reasons set forth above, all of the Current Directors, and, if not all of them, certainly at least a majority of them, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

206.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AudioEye's business and affairs.

208.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

209.   The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the

Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of AudioEye.

210.    As described above, the Individual Defendants violated their fiduciary duties.

211.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

212.    The Individual Defendants had actual or constructive knowledge that the Company violated the law and issued materially false and misleading statements and they failed to correct the Company's public statements.  The Individual Defendants had actual knowledge of the violations of law, misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AudioEye's securities.

213.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AudioEye has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

214.    Plaintiff on behalf of AudioEye has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

215.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

216.    By their wrongful acts and the omissions of material fact that they caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to

1  the detriment of, AudioEye.

2      217.   The Individual Defendants either benefitted financially from the improper

3  conduct and received unjustly lucrative bonuses tied to the false and misleading

4  statements and omissions, or received bonuses, stock options, or similar compensation

5  from AudioEye that was tied to the performance or artificially inflated valuation of

6  AudioEye, or received compensation that was unjust in light of the Individual

7  Defendants' bad faith conduct in setting their own compensation at excessive levels.

8      218.   Defendant Purcell was unjustly enriched from his sale of 2.11% of the

9  Company's stock in the 2014 Offering.

10      219.   Plaintiff, as a shareholder and a representative of AudioEye, seeks

11  restitution from the Individual Defendants and seeks an order from this Court

12  disgorging all profits -- including benefits, stock awards, RSUs and other

13  compensation, including any performance-based or valuation-based compensation,

14  obtained by the Individual Defendants due to their wrongful conduct and breach of their

15  fiduciary duties.

16      220.   Plaintiff on behalf of AudioEye has no adequate remedy at law.

17  **THIRD CLAIM**

18  **Against Individual Defendants for Abuse of Control**

19      221.   Plaintiff incorporates by reference and re-alleges each and every

20  allegation set forth above, as though fully set forth herein.

21      222.   The Individual Defendants' misconduct alleged herein constituted an

22  abuse of their ability to control and influence AudioEye, for which they are legally

23  responsible.

24      223.   As a direct and proximate result of the Individual Defendants' abuse of

25  control, AudioEye has sustained significant damages.  As a direct and proximate result

26  of the Individual Defendants' breaches of their fiduciary obligations of candor, good

27  faith, and loyalty, AudioEye has sustained and continues to sustain significant damages.

28

As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

224.    Plaintiff on behalf of AudioEye has no adequate remedy at law.

### FOURTH CLAIM

**Against Individual Defendants for Gross Mismanagement**

225.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

226.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of AudioEye in a manner consistent with the operations of a publicly-held corporation.

227.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, AudioEye has sustained and will continue to sustain significant damages.

228.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

229.    Plaintiff, on behalf of AudioEye, has no adequate remedy at law.

### FIFTH CLAIM

**Against Individual Defendants for Waste of Corporate Assets**

230.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

231.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, defendants have caused AudioEye to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.

232.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

233.    Plaintiff on behalf of AudioEye has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of AudioEye, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to AudioEye;

(c)    Determining and awarding to AudioEye the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing AudioEye and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AudioEye and its shareholders from a repeat of the damaging events described herein.  The following actions may be necessary to ensure proper corporate governance policies:

1.    a proposal to strengthen the board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.    a provision to permit the shareholders of AudioEye to nominate at least three candidates for election to the board; and

3.    a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding AudioEye restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

1  (g) Granting such other and further relief as the Court may deem just and

2 proper.

3          **<u>JURY TRIAL DEMANDED</u>**

4 Plaintiff hereby demands a trial by jury.

5

6 Dated:  May 16, 2016.

7            **JAMES CHRISTIAN, PLC**

8

By: <u>*/s/ James S. Christian*</u>

9          James S. Christian, State Bar No. 023614

CityScape Phoenix

10         1 E. Washington St., Ste. 500

11         Phoenix, Arizona 85004

*Liaison Counsel for Plaintiff*

12

13         THE BROWN LAW FIRM, P.C.

Timothy W. Brown

14         127A Cove Road

Oyster Bay Cove, New York 11771

15         *Counsel for Plaintiff*

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on May 16, 2016, I electronically filed the foregoing with the

3   Clerk of Court using the CM/ECF system which will send notification of such filing to

4   the e-mail addressed denoted on the Electronic Mail notice list, and I hereby certify that

5   I have mailed the foregoing document via the United States Postal service to the non-

6   CM/ECF participants indicated on the Manual Notice list.

7          I certify under penalty of perjury under the laws of the United States of America

8   that the foregoing is true and correct.

9

10                                                      */s/ James S. Christian*
                                                         James S. Christian (SBN 023614)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

I, LiPo Ching, am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ___14___ day of May, 2016.


_____
LiPo Ching